Kia THOMAS, Plaintiff,

v.

Enis RAGLAND, in his official and individual capacity; Wisconsin Municipal Mutual Insurance Company, a Wisconsin corporation; and the City of Madison, a governmental entity, Defendants.

No. 03–C–343–C.

United States District Court,
W.D. Wisconsin.

July 14, 2004.

Timothy D. Edwards, Oregon, WI, for Plaintiff.

Michael J. Modl, Axley Brynelson, LLP, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This civil rights action arises out of the same events as *Owens v. Ragland*, 313 F.Supp.2d 939 (W.D.Wis.2004), in which Selina Owens, a former coworker of plaintiff Kia Thomas in defendant City of Madison's affirmative action department, accused defendant Enis Ragland of sexually harassing her and then retaliating against her in various ways when she complained. In an opinion and order dated April 12, 2004, I concluded that Owens had failed to show that there were any genuine factual disputes for trial with respect to her claim for retaliation under the First Amendment. However, I concluded that Owens was entitled to present her harassment claim to a jury, which later found that Ragland had made sexual advances toward Owens but that his conduct had not been unwelcome to her.

In this case, plaintiff contends that both defendant Ragland and defendant City of Madison retaliated against her because she sided with Owens when Owens first came forward in 2000 and because she filed an ethics complaint against Ragland and a discrimination complaint against both Ragland and the City after Ragland became director of the affirmative action department in May 2003. Plaintiff asserts claims under both the First Amendment (via 42

U.S.C. § 1983) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

Defendants have filed a motion for summary judgment on all of plaintiff's claims. They advance multiple grounds for dismissal: plaintiff's speech is not protected under the First Amendment or Title VII; many of the actions about which plaintiff complains are not sufficiently severe to be actionable under federal law; plaintiff has failed to show a causal connection between any protected speech and adverse actions taken by defendants; and defendant Ragland is entitled to qualified immunity.

Defendants' motion will be granted in part and denied in part. Plaintiff's ethics and discrimination complaints were protected speech under both the First Amendment and Title VII. Further, there are genuine issues of material fact with respect to whether plaintiff's protected speech motivated defendants to reduce her duties, initiate and conduct investigations against her, restrict her access to the City's computer system and spread false rumors about her. Together, these actions could deter a reasonable person from exercising her rights under Title VII and the First Amendment. Finally, defendant Ragland is not entitled to qualified immunity on these claims. Plaintiff's remaining claims will be dismissed, for the reasons discussed below.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A. *Parties*

In December 1999 or January 2000, plaintiff Kia Thomas began working in the City of Madison affirmative action department as a contract compliance clerk. Plaintiff was later promoted to "Secretary I". The "class description" for the "Secretary I" position provides:

This is responsible secretarial and administrative support work. Employees in this class exercise judgment and discretion in the performance of a variety of activities requiring the interpretation and/or application of policy. Secretary I's often serve as the first level of review and resolution on correspondence and personal contact, and independently gather information, draft routine correspondence, or take other appropriate action to assist managers in the most effective utilization of their time by relieving them of administrative detail. Work at this level may involve leadership responsibilities in coordinating the completion of assignments. Secretary I's typically work under the general supervision of a department or division head.

The position description for the "Secretary I" position in the affirmative action office lists additional duties, such as directing staff and interns, "manag[ing] overall office operations" and "establish[ing], review[ing], maintain[ing] and audit[ing] the work unit filing system and budget process."

Over time, Kirbie Mack, plaintiff's supervisor and the director of the affirmative action department until February 2003, delegated a number of responsibilities to plaintiff, including: budgeting for the department, staffing for the affirmative action commission, taking minutes at department meetings, coordinating work for the clerical pool and supervising clerical workers. As a result, plaintiff was given the "unofficial" title of "office manager." Through these additional duties, plaintiff was able to make important contacts with other management staff and department heads in the city.

Plaintiff was the "confidential secretary" for the director of the department. The confidential secretary deals with all forms

of confidential personnel issues and has access to personnel files. The director and the confidential secretary must have a relationship of trust.

Defendant Enis Ragland was the chief of staff for Mayor Sue Bauman from April 1996 until April 2003. Since that time, Ragland has been the interim director for the affirmative action department.

## B. *Allegations in 2000*

Some time before the end of October 2000, Selina Owens, a coworker of plaintiff's in the affirmative action department, told plaintiff that defendant Ragland was making sexually inappropriate comments to her. (At this time, Ragland was still the mayor's chief of staff.) According to Owens, Ragland told her that he wanted to perform oral sex on her, that he imagined what sex between him and Owens would be like, that he could make her "come" without touching her, that she was an "undercover freak" with "sexual skills" and that he thought she must have "a sweet pussy." In addition, Owens showed plaintiff several emails that she believed were sexually suggestive. Plaintiff concluded that defendant Ragland was sexually harassing Owens. Plaintiff told Owens that she should "not allow it to continue."

Defendant Ragland invited plaintiff to lunch several times. She told him that she was married and had a child. When Owens reported her concerns to Mack, plaintiff went to Mack as well. Plaintiff told Mack that defendant Ragland was trying to hit on her while she was working, that he had invited her to lunch on multiple occasions but she did not want to go and that Ragland asked her, "Did you ever see something so good that you'd like to have but you know you can't?" (Defendants deny that Ragland made this remark, but not that plaintiff reported it to Mack.) Plaintiff told Mack that she believed Ragland used the department as "his play-

ground" and that his interactions with her made her "uncomfortable."

After Owens and plaintiff talked to Mack, Mack went to the mayor. (The parties dispute whether Mack told the mayor that Ragland was sexually harassing employees in the affirmative action department or whether she told the mayor that he was "bothering" employees by spending too much time in the office.) As a result of this meeting, the mayor told Ragland not to visit the affirmative action department unless he had official business there.

## C. *Mack Leaves the Affirmative Action Department*

Before Mack left the department in February 2003, she asked human resources to conduct a reclassification study of plaintiff's position. Reclassification may be justified when an employee is performing duties beyond those outlined in her job description. Reclassification may be accompanied by a pay increase.

Norman Davis was appointed interim director of the department after Mack left. Plaintiff retained her supervisory authority over Nancy Castillo (an employee in the affirmative action office), her responsibility over the budget and her responsibility to coordinate work assignments for the light duty and clerical pool. Although Davis reduced some of plaintiff's duties temporarily, Bauman told Davis to restore the duties that he had removed from her "until some issues are resolved."

## D. *Ragland's Appointment as Director of the Department*

David Cieslewicz became the mayor of the City of Madison in April 2003. When Mack learned that Cieslewicz was considering defendant Ragland to be the interim director of the affirmative action department, she contacted Lamarr Billups, an advisor to the mayor and close friend of

Ragland. She told Billups that the City would have "a liability problem" if Ragland was given supervisory authority over plaintiff and Owens because they had complained about his behavior before.

Billups told Cieslewicz that there was a rumor involving defendant Ragland and female employees in the affirmative action department. Billups may have told Cieslewicz that the rumor involved "inappropriate romantic overtures." Cieslewicz asked either Billups or Janet Piraino, a member of the transition team, "to make sure that there wasn't anything to the allegations." (The parties do not propose any facts about what Billups or Piraino did, if anything, to investigate the allegations.) Cieslewicz appointed defendant Ragland as the interim director of the affirmative action office on April 21, 2003.

Between April 23–25, 2003, plaintiff, Owens and defendant Ragland attended a conference for the Wisconsin Association of Black Public Sector Employees, known as WABPSE. During this conference, Mary Ann Stalcup, the City's Director of Human Resources, received a telephone call from a news reporter, who told Stalcup about a sexual harassment allegation against Ragland. The reporter mentioned both Owens and plaintiff during this conversation. On April 25, Piraino called Ragland at the conference. She told him that a newspaper reporter was asking whether there were sexual harassment allegations against him.

After finishing the telephone call, defendant Ragland summoned Owens out of a training session that she was attending. Ragland told Owens about the conversation he had had with Piraino. Owens then talked to plaintiff, who went back to talk to Ragland. (The parties dispute the exact content of this discussion. According to plaintiff, Ragland told her that he was considering moving her out of the department because she was afraid of working alone with Christie Hill, another employee in the affirmative action department. According to defendants, Ragland said only that moving plaintiff out of the office would be an "option.")

On April 28, 2003, defendant Ragland sent an email to the employees in the department in which he stated that his "plan is to familiarize myself with the AA department and its needs before considering changes to the operational structure." On the same day, Ragland summoned plaintiff into his office, informing her that she would receive less responsibility in the department. Specifically, she would no longer be in charge of monitoring data that the department used for budget allocations.

On April 30, 2003, plaintiff sent defendant Ragland an email in which she expressed her desire not to be moved out of the affirmative action department. In response, Ragland wrote that "moving [plaintiff] out of the office" was "an option, which was based on you stating that you do not feel safe around Norman and Christie because of past experiences." Later the same day, plaintiff wrote to emphasize "the importance of my duties and responsibilities within this agency." Ragland wrote back:

> Yes, you have articulated your desire to maintain the duties and responsibilities delegated to you by Mrs. Mack. I have also stated to you that many of the duties you would like to maintain are the responsibility of the director. While the previous director was comfortable assigning those responsibilities to you, I feel they are my responsibility and I am accountable to the mayor for the AA Department. At this time I do not feel the need for an 'office manager' the unofficial role you indicated that you were delegated by the previous director.

I will assume more of those duties as I learn about the agency and its needs.

### E. *Plaintiff Files Two Complaints*

On May 1, 2003, plaintiff filed an ethics complaint against defendant Ragland with the City of Madison. Plaintiff wrote:

In October of 2000, Selina Owens filed a complaint with the Affirmative Action Department (Manager) Kirbie G. Mack against Enis Ragland (former chief of staff). The basis of her complaint was sexual harassment. Ms. Owens' complaint alleged that Mr. Ragland requested sexual favors.

In October of 2000, I was called as a witness regarding this matter. I too came forward to state that Mr. Ragland had made sexually explicit comments to me and I provided examples. During the investigation, I did state that I did not feel intimidated by Mr. Ragland. I also did stat[e] that the comments were unprofessional and inappropriate. I believe that one other female city employee came forward and stated that she too had experiences wherein Mr. Ragland made inappropriate comments to her. Each person involved in the investigation [was] told at the conclusion of the investigation that Mr. Ragland was prohibited from coming into the AAD. I also observed that between October of 2000 up until his most recent appointment he did not return to our department.

I don't know if the City Human Resource[s] Department is aware of the investigation or the decision surrounding this matter. However, I do know that Mr. Ragland was aware of the decision which was made by the former Mayor Susan Bauman, wherein she prohibited him from entering into the AAD for any reason. This decision was communicated to all front desk staff with the Affirmative Action Department.

1. I believe that Mr. Ragland knowingly failed to relate this information to all the pertinent people when he was competing for the Acting Director position.

2. I also believe that Mr. Lamarr Billups was advised of this complaint prior to Mr. Ragland being appointed. I also believe that the HR Director was aware of this situation before the final appointment was made. If this is the case, I believe that it was inappropriate for the Human Resource Director to fail to investigate the complaint prior to appointing Mr. Ragland as the Acting Director.

3. Selina Owens is out of work right now because of a related issue and I do not believe that it is fair or just for the City to allow this to continue.

While I do not personally feel intimated by Mr. Ragland and I believe that he will conduct himself appropriately, now[,] I do not believe that he should remain as the Acting Director of this agency. The impression that we received at the conclusion of the investigation, was that this was a form of punishment and we would no longer be subjected to his behavior. Therefore, I am requesting that a thorough review of this entire matter takes place. I will state that Mr. Ragland appears to be doing a fine job; however, out of fairness to everyone involved I do not believe that he should continue in the position of Acting Director. I also believe that out of respect and fairness to everyone involved, all City officials who played a role in appointing Mr. Ragland should have at least spoken to the complainant. The City states that it takes a proactive stance against all forms of harassment and for City officials to make hiring decisions without any re-

gard to how said decisions may harm others is reckless and wrong.

In closing, there is a file in the Director's office entitled "Enis Ragland[.]" [T]his file contains all of the pertinent information relative to this case including explicit email communications that Mr. Ragland sent to Selina Owens. Selina Owens also has copies of these records, I believe that there is a[n] audio tape as well. If your body requires additional documentation I would advise that your body investigat[e] this matter by contacting the former Mayor and all of the witnesses involved in this case.

(Bold in original.)

On May 5, 2003, plaintiff filed a second complaint, this time with the Wisconsin Equal Rights Division. In her complaint, she alleged that David Cieslewicz, defendant Ragland and defendant City of Madison had discriminated against her because of her sex and because she had opposed discrimination in the workplace. Specifically, she believed that her job duties were being reduced because of her involvement in a previous sexual harassment complaint against Ragland.

Defendant Ragland learned that plaintiff had filed this complaint on May 6. The same day, he sent an email to Davis and Christie Hill that provided in part:

I discussed with HR and the CA the two complaints filed by Kia against me and my concerns about her continuing to serve as my confidential secretary. I need to know from you, what confidential information is assessable [sic] and/or controlled by Kia.

I propose the following assignments until there is a resolution of her complaints against me.

I will remove all budgetary and supervisory functions from her and direct her to provide clerical support to all staff who request it. She will provide clerical support to David and the CDP as well as staff the AAC. I am thinking of asking Norm to supervise her until the complaints are addressed. Norm I will understand if you don't want to supervise her.

### F. Plaintiff's Leave of Absence

April 30, 2003 was the last day plaintiff reported to work until July 21, 2003. From May 2, 2003, through June 4, 2003, plaintiff called defendant Ragland almost every day. When plaintiff called, she would say that she was "out again today" and "would be in tomorrow or the next day." On May 21, 2003, plaintiff told defendant Ragland that she would be out of the office "indefinitely," in reliance on the advice of her doctor.

### G. Accident Report

On her way to the WABPSE conference, plaintiff was in a minor traffic accident while driving a city vehicle. Shortly after the conference, plaintiff told defendant Ragland that she had completed an accident report in accordance with city policy. She told him again at least two other times before May 14, 2003, when he sent her an email stating that Kevin Houlihan and the City's insurance company needed plaintiff's accident report. Ragland sent plaintiff a second email the same day: "This is to inform you that you are in violation of APM 5–2, which requires the completion of an accident report within 24 hours of the accident." Ragland forwarded the email to Norman Davis, Mary Ann Stalcup, Kevin Houlihan, LaMarr Billups, Christie Hill and assistant city attorney Larry O'Brien. At the time Ragland sent these emails, the information that he had from the City's risk manager was that plaintiff had not yet submitted an accident report.

### H. Computer Access and Responsibilities

On May 15, 2003, defendant Ragland made a number of changes with respect to

plaintiff's computer access. First, he instructed the "help desk" for the city's information services department to replace plaintiff with him and Christie Hill as authorized contacts for the department. The authorized contact is the person responsible for working as a liaison with information services. This person troubleshoots, refers concerns to information services and makes certain that employees have appropriate security access. These duties needed to be performed in plaintiff's absence.

Second, defendant Ragland removed plaintiff as the main Groupwise contact and the contact for "proxy rights on the AA file." Like the authorized contact, the Groupwise contact serves as a liaison to the information services department. It is important to have this duty performed. The employee with proxy rights "monitors the account for citizen contacts with the AAD, as well as calendars of employees."

On May 16, 2003, defendant Ragland instructed Hill to remove plaintiff's access to the "DST System," which is used for payroll entry. On May 21, 2003, Ragland instructed information services to remove plaintiff's access to the city's computer system.

Defendant Ragland is not aware of any other city employee who has been denied access to the City's computer system while on sick leave. Plaintiff was not denied access to the city's computer system when she took a leave of absence from the Madison Equal Opportunities Commission.

### I. *Ragland's Newpaper Interview*

After plaintiff filed her Discrimination complaint, defendant Ragland told a newspaper reporter that plaintiff was a "disgruntled employee." This comment was published in the *Wisconsin State Journal.*

### J. *May 15 Letter*

On May 15, 2003, defendant Ragland sent plaintiff the following letter:

Dear Kia,

I wish to further clarify office practices and procedures. As you indicated your work hours are from 8:00 AM to 4:30 PM. You will be expected to be here during those hours.

Your position description and classification indicate that you are a Secretary I. In all correspondence you should refer to yourself as Secretary. Office Manager is not a city-approved title nor do I believe it is descriptive of your role. As outlined in your position description, you are directed to continue to provide clerical support to me when requested and to other staff. You are directed to continue to provide general administrative and secretarial support for the two commissions and nine committees (e.g. coordination and preparation of the agenda, minutes, processing of items, mailings, drafting routine correspondence and related duties as required.) In an effort to help the department run in a more effective and efficient manner and to best utilize all of the talents in the office, staff members will be allowed to go directly to office support staff, secretarial pool staff or hourly staff, including you to get projects done. You may be requested to coordinate clerical staff projects, but you do not have a supervisory role with the staff. I will resolve any conflicts related to assignment priority setting that cannot be resolved among staff.

As the Acting Director, I am responsible for the budget. In these tight budget times, I need to be able to understand the budget, where we are [ ] facing [a] deficit and where we can perhaps cut items and still obtain a balanced budget. I will be responsible for all budgetary matters. I will review and approve all documents that impact the AA budget. Please give me all of [the] budget information, as well as the city credit card.

Time keeping and time sheets are [ ] critical to the operation of the department. You will continue to collect payroll timesheets and enter the data in a timely manner. However, all payroll information must be reviewed by Christie Hill and approved by me before submission to the Comptroller.

Lastly, confidentiality is an essential part of your responsibility. Confidential information that you may glean during the daily course of your work is to remain strictly confidential.

In a letter dated May 28, 2003, plaintiff responded to defendant's May 15 letter. She wrote that she did not have any "budget information" in her possession and that she had returned the credit card to the comptroller's office. In addition, she informed Ragland that a rental car had been charged to the city credit card when she failed to cancel her reservation for a planned business trip that was cancelled. However, "all charges were reversed and charged to [plaintiff's] personal visa account."

### K. *June 4 Letter*

After speaking with plaintiff on the telephone on May 30, 2003, defendant Ragland wrote plaintiff a letter dated June 4, 2003, in which he raised a number of subjects, including the following: (1) he informed plaintiff that as of May 30, 2003, the comptroller's office had no record of receiving the city credit card that plaintiff had told Ragland she had returned; however, he had been informed that plaintiff had returned the card after that date; (2) he informed plaintiff that because her return date was unknown, her card was cancelled and her authority to use the car was removed; and (3) he informed plaintiff that there was no need for her to have computer access because her doctor had instructed her not to work. In addition, he told plaintiff that neither the "Risk Manager" nor "Motor Equipment" had received her accident report. He asked her whether she had filed the report and, if so, when. Ragland sent copies of his letter to Stalcup, Piraino and O'Brien.

### L. *Investigations of Plaintiff*

When defendant Ragland was appointed, the department was in "a state of chaos." The employees in the department were complaining about one another. Ragland was told that supplies were missing from the department, including a notebook computer and money from a fund raising event. He did not investigate the missing supplies or funds. Complaints to Ragland from employees were so frequent that it "got to the point [he] indicated [he] didn't want to hear anything else about what happened prior to [his] becoming director." Defendant Ragland instructed the employees in the department to submit complaints about other employees in writing. Ragland did not receive a written complaint about plaintiff.

Defendant Ragland did not view it as his responsibility to report "serious instances of dishonesty" that occurred before his arrival. However, "if there were issues that Norman Davis had initiated and began to look into," Ragland believed that those issues "should be completed."

Shortly after defendant Ragland was appointed, he delegated certain payroll functions to Christie Hill. Hill told Ragland that her review of the records led her to believe that plaintiff, Selina Owens and a third employee might have falsified time records in late December 2002 and early January 2003. Ragland did not ask Hill to prepare a written complaint.

On May 6, Ragland sent the following email to Dick Grasmick, the director of information services for the City of Madison:

Hi Dick,

Please accept this email as my request to IS for general information on email generated between 12/22/02 and 1/4/03 for the following employees:

Kia Winters (Thomas)

Selina Maggit (Owens)

Donald Studesville

Please let me know if you need additional information.

When defendant Ragland did not receive any emails as a result of his request, he turned over Hill's reports on the questionable time records to the human resources department.

There is no city policy stating that only department heads may request emails from information services. Brad Wirtz, the labor relations specialist for the City, could have obtained the information.

On May 9, 2003, Lavonne LaFave–Bennett, an employee with the parks department for the City, called defendant Ragland after reading a newspaper article regarding the complaints filed by plaintiff. She contacted him because she "did not believe that the full story was being told." LaFave–Bennett told Ragland that she had felt threatened by plaintiff in a conversation that took place in 2002. After meeting with her in person, Ragland asked her if she would be willing to meet with the city attorney or someone else in that office. The same day, LaFave–Bennett received a call from assistant attorney O'Brien, who asked her about her allegation.

On May 13, 2003, Hill told Wirtz that plaintiff had been accessing Hill's emails without permission.

On May 12, 2003, the human resources department assigned Wirtz to investigate the allegations of falsifying time sheets, yelling at LaFave–Bennet and accessing Hill's email without authorization. Wirtz notified plaintiff of the investigations on May 27, 2003.

With respect to the false time sheets allegation, Mack had approved all of the time sheets that plaintiff submitted during the time period in question. However, Wirtz did not ask Mack whether she had approved plaintiff's time. Instead, Wirtz sent Mack an email, asking whether plaintiff had been working at Mack's house and, if so, what plaintiff was working on. Although Wirtz concluded that plaintiff "did not work all of the hours for which she was paid as indicated on her time sheet," the human resources department did not take any action against plaintiff because the results of the investigation were inconclusive.

On May 27, 2003, Wirtz initiated an investigation into Lafave–Bennett's complaint. He concluded in his report that plaintiff "spoke loudly and inappropriately to LaFave." The City chose not to discipline plaintiff for this incident because of the lapse of time between the incident and the report.

Wirtz does not remember when the City of Madison ever investigated anyone other than plaintiff for talking loudly. Another city employee had talked to him in a loud and inappropriate voice but the City did not conduct an investigation. In addition, he has never been asked to initiate an investigation regarding conduct that had occurred more than six months earlier unless the situation was ongoing. In 2001, plaintiff reported to Wirtz that a coworker had called her a "bitch" and threatened her physically. Wirtz did not investigate this incident.

Finally, Wirtz concluded in his investigation report that plaintiff "knowingly accessed Ms. Hill's email without authorization." However, Wirtz did not identify a city policy that prohibited plaintiff from accessing another employee's email when she had proxy rights to do so. During the course of this investigation, plaintiff told

Wirtz that Hill had violated confidentiality rules, but Wirtz did not investigate this allegation.

### M. *Plaintiff's Return to Work*

In July 2003, plaintiff's doctor "cleared" her to return to work. In a letter to the mayor dated July 17, 2003, plaintiff wrote: "I am scared about returning because Mr. Ragland continues to serve as the Director of the department. ... I am particularly concerned that Mr. Ragland will continue to retaliate against me for expressing my concerns." After discussing the issue with the human resources department and legal counsel, the "Mayor's Office" decided to reassign plaintiff to a "Secretary I" position in the Madison Equal Opportunities Commission. Plaintiff did not agree with this decision. (It is not clear whether plaintiff raised her objection with defendants.)

In a letter to plaintiff, Stalcup provided two reasons for the decision: (1) plaintiff had indicated that she was uncomfortable working with defendant Ragland; and (2) plaintiff's position in the affirmative action office was as defendant Ragland's "confidential secretary," a position requiring a "trusting relationship [that] does not exist between [plaintiff and defendant Ragland] at this time."

Both positions were classified as "Secretary I," both were full time and both received the same pay. The human resources department told plaintiff that the reassignment would be temporary.

Plaintiff's positions in the affirmative action department and the Equal Opportunity Commission differed in a number of respects. In the affirmative action department, plaintiff reported directly to the department director, staffed nine committees, commissions and subcommittees, acted as a liaison between the department and the commission and had "programmatic responsibilities." In addition, she was responsible for the budget and for "the work flow of the clerical staff." In the department, plaintiff was allowed to "flex" her schedule and attend classes that were paid for by the city. Plaintiff had none of these responsibilities or benefits at the Madison Equal Opportunity Commission.

The human resources department informed plaintiff that she could not collect her belongings in the affirmative action department. Instead, her belongings were sent to the human resources department. Plaintiff discovered that some of her things were missing, including a pen and pencil set and some of her personal files. In addition, the information in plaintiff's Personal Digital Assistant had been erased and a ceramic cat had been broken. Although defendant Ragland entered plaintiff's cubicle while she was absent, he did not pack up her personal items but asked another employee in the department to do so.

### N. *Open Records Requests*

On May 20, 2003, plaintiff received a letter from the city attorney's office, explaining that the City was conducting an independent investigation of the allegations made by Owens. Plaintiff withdrew her ethics complaint after receiving this letter. Further, she participated in the investigation by providing written answers to written questions. During the investigation, the City received an open records request from Marc Eisen, the editor of *Isthmus,* for emails sent and received by plaintiff between February 14, 2003, and April 19, 2003. Grasmick, the City's director of information services, wrote plaintiff that he had determined that "the public interest in disclosure of these messages outweighs the public interest in non-disclosure. I therefore intend to comply with the law's presumption of openness of records and to release unredacted (unblackened out) copies of all the messages." In

addition, he told plaintiff that she could appeal his decision to the Circuit Court for Dane County. He enclosed copies of the emails that would be released, one of which fell outside the date requested by Eisen.

In response, plaintiff wrote a letter to Grasmick expressing her belief that "it would be highly inappropriate for the City to selectively disclose information that may further damage my reputation." She wrote that she did "not have the resources to hire an attorney" in order to challenge Grasmick's decision. She asked him to reconsider. The emails were released and shortly thereafter the *Isthmus* ran an article "in which Ms. Thomas' motives and credibility [were] called into question."

In a letter dated August 28, 2003, Mayor David Cieslewicz wrote plaintiff about several more open records requests from the media seeking a copy of the City's report on its investigation of Owens's allegations. Like Grasmick, Cieslewicz concluded that the public interest in disclosure outweighed the interest in non-disclosure and that plaintiff's name would not be redacted. The City later revised this position. In a letter to plaintiff's counsel, assistant city attorney O'Brien wrote that plaintiff would be treated "as other witnesses," meaning that he would "redact her name and other personally identifiable information from the report and the exhibits." However, the City would not redact her name from references to documents that were "already in the public domain." In the released version of the report, plaintiff's name was visible in two places. On page 22, the report states: "Ms. Thomas calls herself the 'Office Manager' for the Affirmative Action Department, even though there is no such position in the AAD." Plaintiff's complaint before the equal rights division includes an allegation about plaintiff being the office manager. Page 28 of the report contains several references to plaintiff's name. Plaintiff is unaware of any unredacted information on page 28 that is not contained in a public document.

## DISPUTED FACTS

I find that the following facts are genuinely disputed; I have construed them in favor of plaintiff as favorably as the record permits. *Hunt v. City of Markham, Illinois,* 219 F.3d 649, 652 (7th Cir.2000).

From 1997 to 2000, defendant Ragland made social visits to the affirmative action department as often as twice as week and for as long 30 minutes each visit. Ragland made plaintiff uncomfortable when he would visit with her because occasionally his eyes "meandered all over her body." In addition, Ragland told plaintiff she was attractive and that "any man who had her was lucky."

After plaintiff and Owens reported their concerns to Mack, Mack told defendant Ragland that female employees in the affirmative action department "had come forward to express concerns regarding his behavior." Ragland then called Owens; he asked her whether she had reported him to Mack.

During the week of April 15, 2003, plaintiff called the mayor's office to discuss Mayor Bauman's transition. Defendant Ragland answered the telephone. He told plaintiff that the "2000 complaint" was interfering with his appointment as the director of the affirmative action department. Plaintiff told Ragland that he had been "out of line" in the way he behaved in 2000. Ragland told plaintiff that "he was never trying to hurt anybody."

Plaintiff told defendant Ragland on May 14, 2003, that she planned on returning to work on May 16, 2003.

Billy Harris is an employee of the Equal Rights Division of the Department of

Workforce Development for the State of Wisconsin. On June 23, 2003, defendant Ragland admitted to Harris that he had told two others that Harris and plaintiff were "seeing each other." Ragland apologized for spreading the rumors and agreed not to make "similar slanderous accusations" in the future.

## OPINION

### A. Scope of Plaintiff's Claims

■ Plaintiff Kia Thomas asserts two claims of retaliation, one under the First Amendment and 42 U.S.C. § 1983 against defendant Enis Ragland and one under Title VII against defendant City of Madison. Plaintiff asserts a claim against Ragland in both his official and personal capacity. However, a claim against a public officer in his official capacity is a claim against the entity for which he is an agent. *Richman v. Sheahan*, 270 F.3d 430, 439 (7th Cir.2001). To hold the City of Madison liable under § 1983, plaintiff would have to show that a policy or custom of the City was a "moving force" of the retaliatory acts, *White v. City of Markham*, 310 F.3d 989, 998 (7th Cir.2002), which she has not done. Accordingly, I will dismiss plaintiff's claim against defendant Ragland in his official capacity.

■ A preliminary dispute between the parties concerns the proper scope of plaintiff's claims. In her brief, plaintiff identifies four acts that she believes prompted defendants to retaliate against her: (1) her statements to Kirbie Mack in 2000 that defendant Ragland had acted inappropriately; (2) the ethics complaint that she filed on May 1, 2003; (3) the complaint she filed with the equal rights division on May 5, 2003; and (4) a telephone conversation she had with defendant Ragland in April 2003. In addition, she identifies numerous retaliatory acts, including a failure to reclassify her position. Defendants argue that plaintiff should not be able to expand her claims to encompass new ones based on the failure to reclassify or on any of the statements she made beyond those in her ethics and Discrimination complaints because she is asserting those claims for the first time in her brief.

I agree with defendants with respect to plaintiff's claims that defendants retaliated against her as a result of the April 2003 telephone conversation · and that defendants retaliated against her by refusing to reclassify her position. Plaintiff's complaint contains no allegations relating to an April 2003 conversation. Further, although plaintiff's complaint includes a list of many retaliatory actions, the failure to reclassify her position is not among them. To state a claim for retaliation under either the First Amendment or Title VII, it is not necessary to plead facts showing that the plaintiff is entitled to relief. However, to comply with Fed.R.Civ.P. 8, a plaintiff must provide the defendant with notice of her claim, which means that she must identify the alleged retaliatory acts of the defendant as well as the protected act that prompted the retaliation. *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir.2002) (complaint would be insufficient if it contained only allegations that defendants had retaliated against plaintiff for filing suit and none identifying suit or acts alleged to have constituted retaliation). Because plaintiff did not give defendants notice in her complaint of her claim that defendants retaliated against her because of an April 2003 telephone conversation or that she was seeking relief for the failure to reclassify her position, she may not proceed with these claims. The Court of Appeals for the Seventh Circuit has held that a plaintiff may not amend her complaint through arguments in her brief in opposition to a motion for summary judgment, but this is exactly what plaintiff has attempted to do. *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir.2004); *Whitaker v. T.J. Snow Co.*, 151

F.3d 661, 664 (7th Cir.1998). *See also Bethany Pharmacal, Inc. v. QVC, Inc.*, 241 F.3d 854, 861–62 (7th Cir.2001) (court did not err in denying motion to amend complaint when defendant had already filed motion for summary judgment).

■ However, defendants do not deny that plaintiff identified in her complaint her statements from 2000, her ethics complaint and her Discrimination complaint. Her references to these matters was sufficient to put defendants on notice that they were part of her claims. Defendants complain that, during discovery, plaintiff gave defendants the impression that her First Amendment claim was limited to her ethics complaint. During her deposition, counsel for plaintiff objected when defense counsel asked plaintiff what "speech [she was] claiming that [she] engaged in that's protected" under the First Amendment. Dep. of Thomas, at 65, *attached to* Aff. of Modl, dkt. # 46, Exh.# 4. Defendants asked for the same information in an interrogatory. Plaintiff objected again, on the ground that defendants were asking for a legal conclusion. However, without waiving her objection, she answered that her ethics complaint was protected speech.

Defendants do not point to any legal authority requiring exclusion under these circumstances. *NutraSweet Co. v. X–L Engineering Co.*, 227 F.3d 776, 786 (7th Cir.2000) (rejecting defendant's argument that evidence should be excluded because defendant was "sandbagged" by plaintiff because defendant cited no supporting authority). To the extent that defendants believed that plaintiff was making unfounded objections in depositions or answers to interrogatories, it was defendants' obligation to file a motion to compel under Fed.R.Civ.P. 37(a)(2). Generally, a court may exclude evidence for discovery violations only when the party has refused to comply with a court order. Fed.R.Civ.P. 37(b)(2)(B).

Potentially, defendants could rely on Fed.R.Civ.P. 26(e)(2), which requires parties to supplement incomplete responses made during discovery. However, even assuming that plaintiff violated this rule (defendants do not cite the rule in their briefs), I could not impose a sanction if her failure to comply was substantially justified or harmless. Fed.R.Civ.P. 37(c)(1); *McCarthy v. Option One Mortgage Corp.*, 362 F.3d 1008, 1012 (7th Cir.2004); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir.2003). At least some of the blame for plaintiff's nonresponsiveness can be attributed to defendants. They asked plaintiff in her deposition to identify her protected speech, which calls for a legal conclusion, *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir.2004), instead of asking what she said or did that caused defendants to retaliate against her. Lay witnesses are not required, or even permitted, to testify about questions of law. *United States v. Espino*, 32 F.3d 253, 257 (7th Cir.1994).

Defendants *were* entitled to learn plaintiff's theory of the case through interrogatories. Fed.R.Civ.P. 33; *American Nurses' Association v. Illinois*, 783 F.2d 716, 723 (7th Cir.1986) ("defendant could serve contention interrogatories on the plaintiff to learn the theory behind the claim"). Thus, to the extent that plaintiff failed to supplement her interrogatory responses as required by Rule 26(e)(2), this failure may not have been substantially justified. But defendants would still have to show that they were unfairly prejudiced by the violation, which they have not even attempted to do. Defendants knew that the discrimination complaint was part of the case as part of plaintiff's Title VII claim against the City. They would have a difficult time arguing that they needed to engage in additional discovery to refute plaintiff's allegation that defendant Ragland was motivated by the Discrimination complaint in taking adverse actions against her because

they had a full opportunity to take discovery on this point in preparing to defend against plaintiff's Title VII claim. Further, defendants do not suggest that they would have tried to argue that the Discrimination complaint was not protected under the First Amendment; in fact, they appear to concede that it was. Accordingly, I will consider plaintiff's claim that defendant Ragland retaliated against her for filing the Equal Rights Division complaint as well as her claim that the City retaliated against her on this same basis.

With respect to plaintiff's Title VII claim, defendants argue that plaintiff should not be permitted to argue that she opposed sex discrimination in any medium other than the Equal Rights Division complaint. Again, defendants assert that, during discovery, the Discrimination complaint was the only "oppositional activity" plaintiff identified. In their brief, the only citation defendants provide in support of this argument is to pages 64 and 65 of plaintiff's deposition. However, there is no mention of plaintiff's Title VII claim in that portion of the deposition or in the pages immediately before or after. Further, the only authority defendants point to in supporting this argument are several cases discussing the "sham affidavit" rule, under which a court may strike an affidavit that contradicts prior deposition testimony. *E.g., Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 615 (7th Cir.2002); *Cowan v. Prudential Insurance Co. of America*, 141 F.3d 751, 756 (7th Cir.1998); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168–70 (7th Cir.1996). However, defendants do not cite an affidavit that is inconsistent with plaintiff's deposition testimony, so this rule does not apply. Accordingly, I will consider plaintiff's claim that the City retaliated against her for filing the ethics complaint and for her involvement in Owens's 2000 allegations against Ragland.

### B. *Protected Conduct*

■ A threshold requirement in any retaliation case brought under the First Amendment or Title VII is that the plaintiff engaged in conduct or speech that is protected by the law. In the public employment context, the First Amendment guarantees the right to speak out on matters of public concern so long as the employee's interest in doing so is not outweighed by the government's interest in efficiency and effectiveness. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The scope of protection under Title VII is more limited. It prohibits an employer from retaliating against an employee who opposes discriminatory practices or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

Plaintiff contends that both her ethics complaint and Discrimination complaint are entitled to First Amendment protection and that her ethics complaint, her Discrimination complaint and statements to Mack in 2000 are protected by Title VII. Surprisingly, she does not argue that her comments in 2000 constitute protected speech under the First Amendment, so I will not consider that question. Defendants appear to concede that the Discrimination complaint is protected both under the First Amendment and Title VII. Thus, the issues are whether plaintiff was exercising her right to free speech when she filed the ethics complaint and whether she was "opposing" conduct that violated Title VII when she talked to Mack in 2000 and filed the ethics complaint in 2003.

#### 1. *Ethics complaint*

##### a. First Amendment protection

###### 1) false and reckless statements

■ Before considering whether plaintiff's ethics complaint addressed a matter

of public concern, I must address defendants' argument that the complaint is entitled to no First Amendment protection because it contains false statements. *McGreal v. Ostrov*, 368 F.3d 657, 673 (7th Cir.2004) (falsity of statement "not normally relevant to the question whether the issue was a matter of public concern"). Even outside the public employment context, the First Amendment does not protect false statements that are made with knowledge that they are false or with reckless disregard for the truth. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *Pickering*, 391 U.S. at 574, 88 S.Ct. 1731, the court held that this standard applies to speech of public employees in cases "in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication." Recently, the Court of Appeals for the Seventh Circuit has concluded (with little discussion) that the *New York Times* test applies to *all* speech by government employees when they are addressing matters of public concern, *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 942 (7th Cir.2004), even though the Supreme Court expressly rejected an invitation in *Pickering*, 391 U.S. at 569, 88 S.Ct. 1731, to apply *New York Times* as "a general standard against which all [speech by public employees] may be judged." In any event, defendants do not argue for a different standard, so it is the one that I shall apply.

Defendants point to five statements in plaintiff's ethics complaint that they assert are false: (1) Selina Owens "filed a complaint" with the affirmative action department in 2000; (2) plaintiff was a "witness" in this matter; (3) there was an "investigation" of Owens's complaint in 2000; (4) defendant Ragland made "sexually explicit comments" to plaintiff; and (5) another city employee stated that Ragland had made inappropriate comments to her.

With respect to the first three statements, the most that can be said is that plaintiff's choice of words was not as precise as it could have been. It is true that Owens did not file a formal complaint in 2000, that the City did not conduct a formal investigation and that plaintiff did not testify at a trial or hearing. However, Owens did *complain* to the director of the affirmative action department, plaintiff did report her own concerns to the director and the director did take Owens's and plaintiff's allegations to the mayor, who as a result told defendant Ragland not to visit the affirmative action office unless he had official business there. (Although the parties dispute whether Mack told Bauman that employees were complaining about sexual harassment, it is undisputed that Mack told Bauman that Ragland was "bothering" employees.)

Plaintiff's uses of the words "complaint," "witness" and "investigation" would not be identical to the definitions one would find in Black's Law Dictionary, but they were "substantially correct," which is all they were required to be. *Pickering*, 391 U.S. at 570, 88 S.Ct. 1731; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (inaccurate quotation is not "false" under *New York Times* test "unless the alteration results in a material change in the meaning conveyed by the statement"). I note also that defendants fail to explain how they were harmed by these asserted inaccuracies, which is another factor that the Court considered in *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731 (noting that plaintiff's false statements "would not normally have any necessary impact on the actual operation of the schools"). *See also Ceballos v. Garcetti*, 361 F.3d 1168, 1179 (9th Cir.2004) (even recklessly false statement may be protected if it did not cause defendant injury).

■ With respect to the fourth statement, I cannot say that defendants have established as a matter of law that defendant Ragland did not make sexually explicit comments to plaintiff. It is true that the statements recalled by plaintiff in her deposition would be more accurately described as having sexual *connotations* rather than being sexually *explicit*, for example, Ragland's alleged question to plaintiff, "Have you ever seen something that you really wanted but could not have?" when she declined his lunch invitation. However, even assuming that plaintiff's characterization of this statement in her complaint was not "substantially correct," plaintiff testified that Ragland made additional comments that she can no longer recall. Defendants question the likelihood that plaintiff would have remembered sexually explicit statements in 2003 but then forgotten them by 2004. Defendants' point is well taken, but it is one for the jury and not this court. Siding with defendants on this issue would require a credibility determination, which is not permitted in deciding a motion for summary judgment. *Morfin v. City of East Chicago*, 349 F.3d 989, 999 (7th Cir.2003).

■ Finally, defendants have not met their burden to show that plaintiff exhibited a reckless disregard for the truth when she stated that she "believe[d]" that a third female employee had complained about "inappropriate" comments that defendant Ragland had made. Defendants must show that plaintiff "in fact entertained serious doubts as to the truth" of her statement. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Defendants' only evidence of this is that plaintiff relied on hearsay when she made the statement, but they point to no authority requiring public employees to insure that their statements comply with the Federal Rules of Evidence before they express an opinion. *See Clyburn v. News World Communications,*

*Inc.*, 903 F.2d 29, 34 (D.C.Cir.1990) (by itself, reliance on hearsay does not show reckless disregard for truth). To meet their burden, defendants would have to adduce evidence that plaintiff had reason to doubt the veracity of her source of information, which they have failed to do.

Even if I were to assume that some of the statements in plaintiff's ethics complaint were false and made with reckless disregard for the truth, this would not mean that I could conclude that the entire ethics complaint was stripped of any First Amendment protection. As plaintiff points out, the Supreme Court has recognized that parts of a document may be protected while others are not. *Connick v. Myers*, 461 U.S. 138, 149, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (noting that one question on questionnaire touched upon matter of public concern). The "gist" of plaintiff's ethics complaint is that defendant Ragland should not have been made director of the affirmative action department after at least two women in that department had complained about inappropriate behavior and were later told that his presence in the department would be restricted. Defendants do not contend that this basic allegation was made with reckless disregard for the truth. *Masson*, 501 U.S. at 517, 111 S.Ct. 2419 ("Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'") (quoting *Heuer v. Kee*, 15 Cal.App.2d 710, 59 P.2d 1063, 1064 (1936)). Accordingly, I cannot dismiss plaintiff's First Amendment claim on this ground.

*2) public concern*

■ A court must examine three aspects of a statement to determine whether it addresses a matter of public concern: content, form and context, with the greatest emphasis on content. *Gustafson · v. Jones*, 290 F.3d 895, 906–07 (7th Cir.2002);

*Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974 (7th Cir.2000). Defendants do not argue seriously that the content of plaintiff's ethics complaint fails to touch on a matter of public concern. They assert that plaintiff's complaint does not in fact identify any violations of the City's ethics code, but whether this is true is not relevant. Matters of public concern are not limited to violations of state or municipal law and First Amendment protection does not turn on whether an employee picked the right form to fill out. *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002). As noted above, plaintiff challenged the City's decision to appoint defendant Ragland director of a department that included women whom he had sexually harassed or toward whom he had acted inappropriately. It is not difficult to conclude that this is a matter "in which the public might be interested." *Dishnow v. School District of Rib Lake*, 77 F.3d 194, 197 (7th Cir.1996).

Defendants argue, however, that even if the subject matter of the ethics complaint might implicate matters of public concern, the context of plaintiff's speech shows that she filed the complaint because she was angry with defendant Ragland for reducing her job responsibilities. Although an employee's motives in speaking out are relevant in determining whether speech addresses a matter of public concern, very rarely is speech deemed unprotected under the First Amendment simply because the employee's reasons for coming forward were not completely selfless. Free speech rights are not limited to white knights and martyrs. If they were, many important issues would never be brought to light. *Breuer v. Hart*, 909 F.2d 1035, 1039 (7th Cir.1990) ("Wrongdoing may often be revealed to the proper authorities only by those who have some personal stake in exposing wrongdoing.") Thus, the court of appeals has held that speech on an important topic does not lose its value whenever the speaker has something to gain. Rather, unless the employee's *only* motive is to further a purely private interest, the speech remains within the scope of public concern. *Gustafson*, 290 F.3d at 908; *Spiegla v. Hull*, 371 F.3d 928, 939 (7th Cir.2004) (criticizing district court because it "improperly elevated motivation to a litmus test and thereby undervalued the important content of [the plaintiff's] speech").

In this case, I cannot conclude as a matter of law that plaintiff's motives in filing the complaint were purely personal. The primary piece of evidence on which defendants rely is that the filing of plaintiff's complaint closely followed defendant Ragland's reduction of her job duties. As defendants point out in a different context, temporal proximity is rarely enough to demonstrate an issue of fact with respect to motive, much less establish motive as a matter of law. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004); *Galdikas v. Fagan*, 342 F.3d 684, 697 (7th Cir.2003). Defendants point to other facts challenging plaintiff's motives, but none of them shows as a matter of law that plaintiff's ethics complaint was nothing more than a petty personal gripe. Defendants' arguments are more appropriately considered by a jury.

Once a court determines that an employee's speech addresses a matter of public concern, it must balance the employee's interest in speaking out against the employer's interest in "providing effective and efficient services." *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir.2004). It is the government's burden to show that its interests outweigh the employee's. *Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir.1999). With the exception of the decision to reduce plaintiff's duties, defendants do not argue that any of defendant Ragland's actions against plain-

tiff would be a necessary or appropriate response to plaintiff's ethics complaint or Discrimination complaint. Accordingly, I will consider the balancing test in the context of evaluating that decision below.

### b. Protection under Title VII

■ Plaintiff contends that her ethics complaint is protected by Title VII's provision that prohibits employers from discriminating against an employee "because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e–3(a). Specifically, she argues that she opposed sexual harassment in her ethics complaint. Defendants deny that the ethics complaint opposes any conduct prohibited by Title VII; they argue that, at most, it is concerned with plaintiff's belief that "it was inappropriate that Mr. Ragland was appointed to the director position without any consideration/disclosure of events that allegedly occurred back in the year 2000." Dfts.' Br., dkt. #24, at 25.

This is an unjustifiably narrow reading of the complaint. As noted above, plaintiff makes it clear in her complaint that she is concerned with the City's decision to appoint defendant Ragland as director of a department that employs a woman who plaintiff believed was sexually harassed by Ragland. Plaintiff wrote: "The City states that it takes a proactive stance against all forms of harassment and for City officials to make hiring decisions without any regard to how said decisions may harm others is reckless and wrong."

Defendants do not deny that opposing sexual harassment is protected under Title VII, even if the perception of harassment is mistaken. *Hamner v. St. Vincent Hospital and Health Care Center, Inc.*, 224 F.3d 701, 706 (7th Cir.2000) (plaintiff entitled to protection for opposing conduct that is not in violation of Title VII so long as plaintiff's belief is sincere and reasonable). However, defendants could argue

that plaintiff was not objecting to sexual misconduct by defendant Ragland, at least not directly. Rather, she was challenging the City's *response* to Ragland's conduct. Is one "opposing" sexual harassment by opposing an employer's failure to respond to it properly?

I recognize that answering this question in the affirmative would go beyond what the court of appeals has recognized thus far as conduct opposing discrimination. *E.g., Wyninger*, 361 F.3d 965 (sexual harassment complaint); *Fine v. Ryan International Airlines*, 305 F.3d 746 (7th Cir.2002) (letter complaining of sex discrimination); *Hall v. Bodine Electric Co.*, 276 F.3d 345, 357 (7th Cir.2002) (reporting sexual harassment of coworker); *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir.2001) (reporting harassment to police). Although plaintiff is asking for an expansive interpretation of the statute, I do not believe that the interpretation is inconsistent with the language or purpose of Title VII. Plaintiff was bringing to light allegations of sexual harassment; such conduct is an important part of deterring future violations. In the absence of controlling precedent to the contrary, I conclude that by challenging favorable treatment of a man accused of sexual harassment, plaintiff was opposing the sexual harassment itself. Thus, plaintiff's ethics complaint was protected conduct under both the First Amendment and Title VII.

### 2. *Involvement in 2000 allegations*

■ Plaintiff admits that she did not believe that defendant Ragland was sexually harassing her in 2000. Rather, she thought his behavior was "inappropriate." She has therefore conceded that statements made in opposition to his treatment toward her would not be protected under Title VII. Opposition to "inappropriate" behavior would not be covered by the stat-

ute unless the employee reasonably believed that the behavior was actually sexual harassment. Thus, to obtain protection under Title VII, plaintiff must show that she was "opposing" Ragland's conduct toward Owens when she went to Mack. *McDonnell v. Cisneros*, 84 F.3d 256 (7th Cir.1996) ("assisting another employee with his (in this case her) discrimination claim, as well as other endeavors to obtain the employer's compliance with Title VII, is protected 'opposition conduct' ").

Looking at the content of plaintiff's comments, it would appear that they were independent of Owens's concerns. Plaintiff did not voice support for Owens or even tell Mack that she was coming forward to bolster Owens's case. *E.g., Novotny v. Great American Federal Savings and Loan Association*, 584 F.2d 1235 (3d Cir.1978) (supporting other employee's sex discrimination complaint at board meeting is protected). Instead, she told Mack only about instances of conduct by defendant Ragland toward *her*. Because plaintiff did not believe this conduct was sexually harassing, the subject matter of plaintiff's comments to Mack did not address a practice that is made unlawful by Title VII.

The parties devote substantial energy to the *reasons* plaintiff talked to Mack. Defendants point to deposition testimony of plaintiff in which she said that her comments to Mack were not "necessarily" in support of Owens. Plaintiff relies on her affidavit, in which she avers that she went to Mack in part because she wanted Ragland to stop sexually harassing Owens. However, neither side cites any case law in which a court held that a plaintiff's motivations were dispositive in determining whether she was opposing discrimination. Rather, the analysis is an objective one: was the employee objecting to discriminatory treatment against herself or another employee? In this case, the answer to this question is no. Although Owens's allega-

tion may have been the impetus for plaintiff to come forward, I cannot conclude that this is sufficient to bring plaintiff's comments within the protection of the opposition clause.

Plaintiff does not provide a satisfying answer to a basic question: how can an employee oppose conduct toward another by complaining about conduct toward herself? It is difficult to conclude that an employee can be "opposing" conduct within the meaning of Title VII when the employee never even mentions the conduct she is supposedly protesting. Adopting plaintiff's position would mean that any other employee who made allegations against Ragland would be "opposing" sexual harassment, regardless what his or her complaint was about, as long as the employee was inspired to come forward by Owens.

Case law from the First Amendment context is instructive. Regardless of an employee's motive in speaking out, an act of speech is not protected if its *content* does not address a matter of public concern. *Connick*, 461 U.S. at 148, 103 S.Ct. 1684 (concluding that speech was not protected without looking at employee's motives when content was not of "public import"). Similarly, if the content of an employee's statement is not in opposition to discriminatory conduct, Title VII provides no protection.

Plaintiff's conduct appears to be more akin to "participat[ion]" in an investigation under Title VII, which is also protected conduct under § 2000e–3(a). However, plaintiff does not make this argument, perhaps assuming that the events in 2000 would not qualify as an "investigation" within the meaning of the statute. *See EEOC v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir.2000) (internal investigation conducted apart from formal EEOC charge not protected).

One could argue that an employee who comes forward to object to "inappropriate" behavior is no more deserving of retaliation than another who objects to sexual harassment. However, Title VII protects only specific types of conduct; it does not extend to all speech that may serve an important purpose. *Crowley v. Prince George's County*, 890 F.2d 683 (4th Cir. 1989) ("It may be that the downgrading of [plaintiff's] position by the chief of police was wrongful or even spiteful. We have emphasized, however, that Title VII is not a general 'bad acts' statute. Rather, the conduct it prohibits is specifically set forth."). *See also Wimmer v. Suffolk County Police Department*, 176 F.3d 125 (2d Cir.1999) (employee's objection to discriminatory treatment of non-employees not protected under Title VII's opposition clause). Plaintiff could have argued that her statements to Mack in 2000 were protected by the First Amendment, but she did not. Accordingly, plaintiff may not recover for any acts taken by defendants against her as a result of her comments to Mack.

## C. *Retaliatory Actions*

■ Plaintiff identifies a number of actions that she believes defendants took in retaliation for the exercise of her rights under the First Amendment and Title VII. With respect to her First Amendment claim, she points to the following actions by defendant Ragland: (1) reducing her duties; (2) initiating three investigations against her; (3) restricting her computer access and responsibilities; (4) forwarding disparaging letters and emails that he wrote plaintiff to other city officials; (5) calling her a "disgruntled employee"; (6) losing and damaging her belongings; (7) spreading false rumors about her. In addition, plaintiff alleges that the City took the following actions against her in violation of Title VII:(1) reducing her duties; (2) initiating and conducting three investigations against her; (3) reassigning her to the Madison Equal Opportunity Commission; (4) releasing records to the public that damaged her reputation and caused her embarrassment.

Defendants question both whether some of these actions are sufficiently adverse to be actionable and whether any of the actions were motivated by conduct protected under either the First Amendment or Title VII. Before discussing whether defendants are correct, a word is required regarding the standards for causation and adverse actions under both of plaintiff's claims. In *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court held that a public employee asserting a First Amendment retaliation claim must show that her speech was a "motivating or substantial factor" in her employer's decision to take an adverse action against her. (The Court did not provide further guidance on the meaning of "motivating or substantial factor." In *Johnson v. Kingston*, 292 F.Supp.2d 1146, 1153–54 (W.D.Wis.2003), I concluded that protected speech was a substantial or motivating factor when it was one of the reasons for the defendant's decision to take adverse action.) If the plaintiff can make this showing by a preponderance of the evidence, the burden of persuasion shifts to the employer to show that it would have made the same decision without regard to the plaintiff's speech. *Id.* Although the Court of Appeals for the Seventh Circuit has sometimes departed from this standard by requiring plaintiffs to show "but-for" causation, the court reaffirmed the *Mt. Healthy* standard recently in *Spiegla v. Hull*, 371 F.3d at 938–940 (7th Cir.2004).

Under Title VII, disparate treatment claims employ the same basic standard: a plaintiff may establish liability by showing that race, sex, color, religion or national origin was a "motivating factor" in an em-

ployment decision. 42 U.S.C. § 2000e–2(m); *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). However, a difference is that even if the employer proves that it would have taken the same action in the absence of the impermissible factor, the plaintiff may still obtain declaratory relief, some forms of injunctive relief and attorney fees. 42 U.S.C. § 2000e–5(g)(2)(B).

The court of appeals has not made it explicit whether the "motivating factor" standard applies to retaliation claims brought under Title VII. In *McNutt v. Board of Trustees of University of Illinois*, 141 F.3d 706 (7th Cir.1998), the court held that § 2000e–2(m) and § 2000e–5(g)(2)(B) do not apply to Title VII retaliation claims because those provisions refer exclusively to disparate treatment claims. *See also Speedy v. Rexnord Corp.*, 243 F.3d 397 (7th Cir.2001) (reaffirming holding in *McNutt*). However, the question in *McNutt* was not the appropriate quantum of evidence necessary to establish liability but whether a plaintiff could still recover attorney fees if the employer proved its affirmative defense. In most cases, the court of appeals states only that there must be a "causal connection" or "causal link" between the protected conduct and the adverse action, without explaining how strong the causal connection must be. *Lang v. Illinois Dept. of Children and Family Services*, 361 F.3d 416, 419 (7th Cir.2004); *Sitar v. Indiana Dept. of Transportation*, 344 F.3d 720, 728 (7th Cir.2003); *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir.2003).

In *McNutt*, 141 F.3d at 709, the court stated in dicta, "In order to prove a Title VII violation (and thereby recover any relief) based on retaliation, *Price Waterhouse* still requires plaintiffs to establish that the alleged discrimination was the 'but for' cause of a disputed employment action." Taken literally, this statement in

*McNutt* would foreclose liability in any case in which the employee could show only that her protected conduct was a motivating or substantial factor in the decision. However, I do not believe that the court meant exactly what it said.

First, the case on which the court relied for the proposition, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), does not require a plaintiff to show "but for" causation. A plurality of four justices championed a test for all Title VII cases that require the plaintiff to show that an impermissible factor was a "motivating part" in the decision. *Id.* at 244, 109 S.Ct. 1775. The plurality equated this standard to the one set forth in *Mt. Healthy*. *Id.* at 249–50, 109 S.Ct. 1775. Justice White agreed that the *Mt. Healthy* standard applied, but he would have used the term "substantial factor" rather than motivating factor. *Id.* at 259, 109 S.Ct. 1775 (White, J., concurring). In her concurring opinion, Justice O'Connor agreed with Justice White that "substantial factor" was the appropriate standard, but she did not state whether she was using the test from *Mt. Healthy*. Thus, although it is not entirely clear what the controlling standard is in *Price Waterhouse*, it is clear that a majority of Justices agreed that proof of "but for" causation is not required.

Second, the court has used the "but for" standard erroneously in the past. As noted in *Spiegla*, 371 F.3d at 941, the court has required "but for" causation in several First Amendment retaliation cases, though it now acknowledges that such a requirement is inconsistent with *Mt. Healthy*. *Id.* at 942. In any event, in *Spiegla*, 371 F.3d at 943 n. 10, the court of appeals concluded that the causation analysis is the same for retaliation cases brought under Title VII and the First Amendment. Because this is the court's most recent pronouncement

on the issue, I will assume that the causal connection a plaintiff must show in a Title VII retaliation case is the same as under *Mt. Healthy:* the protected conduct was a substantial or motivating factor in the decision.

A second question relates to the types of injuries that are actionable in retaliation claims. For First Amendment claims, the standard is well-established if not precisely defined: whether the defendant's action "is likely to deter the exercise of free speech, whether by an employee or anyone else." *Power v. Summers,* 226 F.3d 815, 820 (7th Cir.2000). The standard is an objective one, viewed from the perspective of a person of "ordinary firmness." *Pieczynski v. Duffy,* 875 F.2d 1331, 1333 (7th Cir.1989).

■■■ The standard under Title VII is not so clear. In disparate treatment cases, the plaintiff must point to a "materially adverse employment action." *E.g., Rhodes v. Illinois Dept. of Transportation,* 359 F.3d 498, 504 (7th Cir.2004). However, both the "employment" and "material" requirements of the standard have been called into question by the Court of Appeals for the Seventh Circuit in the context of retaliation cases. The standard in a disparate treatment case is based on 42 U.S.C. § 2000e–2(a)(1), which prohibits discrimination "with respect to ... compensation, terms, conditions, or privileges of employment" and § 2000e–2(a)(2), which prohibits discriminatory treatment that "adversely affect[s]" an individual's status as an employee. However, the court of appeals noted in *McDonnell,* 84 F.3d at 258–59, that Title VII's retaliation provision does not contain this limiting language. Thus, a retaliatory action need not be employment related to be actionable under Title VII.

■■■ In *Herrnreiter v. Chicago Housing Authority,* 315 F.3d 742, 745–46 (7th Cir.2002), the court questioned whether a retaliatory action must be "materially" adverse under Title VII. Although the court acknowledged that courts often assume that the answer to this question is yes, it noted that such a standard could be criticized, "especially in cases in which an employee is retaliated against for making or more commonly assisting a complaint on behalf of a coworker, as it presumably takes rather little to deter such altruistic action." *Id.* at 746. Thus, the court suggested a standard that mirrors the one in First Amendment cases, that is, whether the defendant's action was sufficiently adverse to deter a reasonable person from engaging in the protected conduct. This is the standard adopted by the Court of Appeals for the Ninth Circuit in *Ray v. Henderson,* 217 F.3d 1234, 1242–43 (9th Cir.2000), and the EEOC in its *Compliance Manual,* § 8, ¶ 8008 (1998), both of which the court in *Herrnreiter* cited approvingly. This is a reasonable definition, particularly in light of the purpose of antiretaliation provisions as stated by the Supreme Court: to "[m]aintai[n] unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

Since *Herrnreiter,* the Court of Appeals for the Seventh Circuit has neither rejected nor adopted expressly the standard it suggested in that case. Instead, in most cases, the court has emphasized what retaliation is not, such as "mere unhappiness and inconvenience," *Haywood,* 323 F.3d at 532, or an "unpleasant environment," *Griffin,* 356 F.3d at 829. Because I find the reasoning in *Herrnreiter* persuasive, until the court repudiates that case, I will assume that the standard for an adverse action is the same for both Title VII and First Amendment retaliation cases.

I pause briefly to comment on the organization of this section of the opinion. Some of the actions about which plaintiff is

complaining are part of her claims under both the First Amendment and Title VII. For example, plaintiff contends that her duties were reduced in violation of both laws. Although plaintiff is suing defendant Ragland for this reduction under the First Amendment and the City under Title VII, the evidence is the same for both claims because defendant Ragland was the only relevant decision maker with respect to both claims. Because the standards for retaliation under the First Amendment and Title VII are the same, I have combined plaintiff's Title VII and First Amendment claims into one discussion when defendant Ragland was the only relevant decision maker for a particular action. With respect to the remaining actions that plaintiff challenges only under Title VII against the City *or* the First Amendment against Ragland, I have indicated in parentheses next to each action which defendant and which legal theory are at issue.

1. *Effect of plaintiff's absences from work*

▮ Throughout their briefs, defendants repeat the observation that plaintiff was not at work when many of the allegedly retaliatory actions occurred. *See* Dfts.' Br., dkt. # 24, at 1 ("Significantly, Thomas was out on leave continuously between May 1, 2003, the day she submitted her Ethics Board complaint, and July 21, 2003."); *id.* at 3 ("It is a fairly remarkable position for Thomas to assert that she was subjected to numerous retaliatory actions while she was never present in the workplace."); *id.* at 13 ("Thomas' theory of retaliation is apparently, 'had I been at work, the actions taken would have been retaliatory.'"); Dfts.' Reply Br., dkt. # 41, at 14 ("It is critical to recall that all of the alleged 'campaign of harassment' occurred while Thomas was off work on various forms of leave.")

It is not completely clear what point defendants are intending to make with this observation. I agree with defendants to the extent that they mean to argue that plaintiff's absence from work could be a non-retaliatory reason for some of the actions about which plaintiff complains. However, I disagree to the extent that defendants mean to argue that plaintiff could not suffer an actionable injury unless she was at work.

As discussed above, retaliatory acts do not need to actually affect a term or condition of employment to be actionable under Title VII or the First Amendment. In fact, retaliatory acts need not be related to employment at all. If a reasonable person would be deterred from exercising her rights because of the defendant's conduct, this is sufficient to invoke protection of the federal laws. Otherwise, there would be a gap in protection in which an employer could chill employees from speaking out by taking insidious but effective actions in response to speech of public concern while remaining free from liability. Thus, plaintiff's absence from work does not bar her from obtaining the protections of either the First Amendment or Title VII.

2. *Reduction in job duties* (First Amendment claim against Ragland and Title VII claim against City)

▮ On April 28, 2003, defendant Ragland told plaintiff that she would no longer be in charge of monitoring data that was used for budget allocations. On April 30, Ragland informed plaintiff that he would "assume more of [the] duties" Mack had delegated to her "as [he] learn[ed] more about the agency and its needs." In a May 6 email to Norman Davis and Christie Hill, Ragland wrote that he "proposed" to "remove all budgetary and supervisory functions" from plaintiff "until there is a resolution of her complaints against me." Finally, in a letter dated May 15, 2004, Ragland told plaintiff that she should refer to her position as "secretary" rather than

"office manager" because "office manager is not a city-approved title nor do I believe it is descriptive of your role." In addition, he informed plaintiff that she did "not have a supervisory role with the staff" and that he was "responsible for the budget."

Defendants do not deny that the loss of authority and responsibility is an injury significant enough to be actionable under the First Amendment and Title VII, even if it is not accompanied by a reduction in pay or benefits. *Tart v. Illinois Power Co.*, 366 F.3d 461, 473–76 (7th Cir.2004); *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.1994). The facts show that by diminishing plaintiff's responsibility, defendant Ragland prevented plaintiff from obtaining a reclassification of her position, which would have led to a new title and increased pay. (Although plaintiff has forfeited her right to recover for the failure to reclassify her position because she never alleged it in her complaint or gave defendants notice that it was a claim she was raising, this does not prevent her from using it to show the injury caused by Ragland's other decisions that are still part of the case.) However, defendants argue that plaintiff did not suffer an injury because Ragland took away only duties that were not a part of her official job description. Defendants' argument is not persuasive.

From plaintiff's perspective, the loss she suffered as a result of the reduction in her duties did not diminish even if she did not have a vested right in performing those duties. In other words, if an employee considering whether to speak out knows that doing so will prompt her supervisor to take away the more meaningful aspects of her employment, it is highly unlikely that she will gain courage when she realizes that it is only because of her supervisor's magnanimity that she has those responsibilities in the first place. If anything, an employee in such a case would more likely be deterred from speaking out because she would know that her options for recourse would be limited if her supervisor decided to retaliate.

Defendants argue also that even if plaintiff was sufficiently injured by the reduction in her duties, she has failed to adduce sufficient evidence showing that defendant Ragland's decision was motivated by her speech. Defendants' main argument on this issue is that Ragland decided to reduce plaintiff's duties before she filed either her ethics complaint on May 1 and her Equal Rights Division complaint on May 5. I agree that Ragland could not have been retaliating against plaintiff for something she had not done yet. *See Morfin*, 349 F.3d at 1005.

Plaintiff makes two arguments in response. First, plaintiff points to the comments she made to Mack in 2000, which of course preceded defendant Ragland's decision. However, I have concluded that these statements are not protected under Title VII's opposition clause. Because plaintiff has not articulated any other bases under Title VII or the First Amendment under which those statements might be protected, I must conclude that any knowledge that Ragland had of those statements is not relevant for the purpose of her retaliation claims.

Second, plaintiff points to defendant Ragland's May 6 email in which he "proposed" the "remov[al of] all budgetary and supervisory functions" from plaintiff "until there is a resolution of her complaints against" him. She contends that this email is direct evidence that her complaints motivated his decision to reduce her duties. I agree. In his May 6 email, defendant Ragland all but admits that he is taking away plaintiff's budgetary and supervisory functions away from plaintiff because of the complaints that she filed. *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir.

2002) (defining "direct evidence" as "evidence that establishes [intent] without resort to inferences from circumstantial evidence").

Defendants insist that this email cannot be probative of defendant Ragland's intent because, again, he had already made up his mind to reduce plaintiff's duties by April 30, before she filed her complaint. Presumably, defendants mean to argue that they have met their burden under *Mt. Healthy* to show that, even absent plaintiff's speech, Ragland would have taken away the same duties from her. Defendants' argument is not without merit, but it is one they will have to make to the jury. Once the burden has shifted to the defendant to show than an impermissible factor did not affect his decision, the "persuasiveness of that showing will normally be for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir.1997). I cannot conclude that a reasonable jury would be compelled to accept defendant's version.

Although defendant Ragland made it clear to plaintiff that her duties would be reduced on April 28 and April 30, it was not until he wrote his letter to plaintiff dated May 15, 2003, that he told plaintiff exactly what she was losing. In his April 30 email, he wrote only that he would assume "more" of the duties that Mack had delegated to her at some point in the future. In the April 28 conversation he identified only one duty specifically, monitoring data for budget allocations. In the May 15 letter, Ragland told plaintiff that she could not refer to herself as "office manager" in the future, that she would no longer have a supervisory role with the staff, that he would be responsible for "all budgetary matters" and that Christie Hill would be reviewing all payroll information.

In addition, he emphasized the "clerical" and "routine" aspects of plaintiff's job. Ragland's earlier communications did not indicate that plaintiff's loss in responsibility would be this great. Further, Ragland wrote in the May 6 email that the new arrangement would be in place "until there is a resolution of her complaints against me," suggesting that she could reacquire some of her lost duties in the future. A reasonable jury could find that Ragland slashed plaintiff's responsibilities more severely than he would have if she had not filed the complaints against him.

■ Defendants argue in the alternative that even if defendant Ragland were motivated by plaintiff's speech in reducing her duties, this decision would be justified because plaintiff held a position of trust and confidence with Ragland. As noted above, under *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, the government is entitled to restrict speech if doing so is necessary for the government to promote effective and efficient public service. Defendants point out correctly that one (out of seven) of the factors involved in this balancing test is "whether the employment relationship is one in which personal loyalty and confidence are necessary." *Gustafson*, 290 F.3d at 909. However, defendants' reliance on the balancing test has several problems.

First, defendants are arguing that plaintiff's speech played no part in any of the decisions she is challenging. Obviously, this is not the same as arguing that defendant Ragland was justified in reducing plaintiff's duties because of her speech. As the court of appeals has emphasized, *Pickering* balancing is not about determining what *could have* justified the government's decision, but whether the government was *actually* motivated by its interest in providing effective and efficient service. *Id.* at 909–10; *see also Ga-*

*zarkiewicz*, 359 F.3d at 948. It is questionable whether defendant Ragland may argue both that plaintiff's speech had nothing to do with the reduction in duties and that her reduction in duties was necessary because she served in a position of trust and confidence.

Even assuming, however, that defendants may argue in the alternative, I conclude that they have failed to show that defendant Ragland's interest in government effectiveness outweighed plaintiff's right to speak out. Defendants have not even attempted to explain why an employee's complaint about sexual harassment may be stifled so that the accused may prevent an employee from learning confidential information. Further, when an employee's speech threatens a relationship of trust and confidence, the usual response is to transfer the employee, or if a transfer is not feasible, dismiss her. *E.g., McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir.1994); *Hobler v. Brueher*, 325 F.3d 1145 (9th Cir.2003). Defendant Ragland, however, did not seek to transfer plaintiff but instead sought to restrict her duties. This might be a reasonable response if Ragland had taken away her access to confidential information about him, but defendants have not shown any relationship between a need for confidence and plaintiff's *budgetary* and *supervisory* responsibilities. Accordingly, I conclude that defendant Ragland's decision to reduce plaintiff's duties was not justified on the ground that plaintiff's position required trust and confidence with Ragland.

### 3. *Investigations against plaintiff*

On May 12, 2003, only a few days after plaintiff filed her ethics and discrimination complaints, the City initiated three investigations against plaintiff, one for falsifying time records, one for "scream[ing]" at another city employee and one for accessing Christie Hill's email without authorization. Plaintiff asserts that each of these investi-

gations was instigated in response to her ethics and discrimination complaints.

a. Initiating the investigations (First Amendment claim against Ragland and Title VII claim against City)

 There is an obvious barrier to plaintiff's success on her claim that defendant Ragland retaliated against her by investigating her for accessing a coworker's email without authorization: plaintiff has adduced no evidence that Ragland had any involvement in this investigation. The facts are not completely clear about who brought this allegation to the attention of Wirtz, who conducted the investigation. It is undisputed both that Wirtz began the investigation on May 12, 2003, and that Hill first spoke to Wirtz about her allegation on May 13, 2003, but neither party proposed any facts about how this allegation first arose. Regardless, it is plaintiff's burden to show that she is entitled to have a jury hear her case. *Markel v. Board of Regents of University of Wisconsin System*, 276 F.3d 906, 910 (7th Cir.2002). Because she has not set forth any specific facts showing that defendant Ragland was personally involved in the investigation, this claim must be dismissed. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995) (under § 1983, defendant not liable unless he was personally involved in constitutional violation).

Defendant Ragland did have some involvement in the other two investigations. With respect to the allegation of falsifying time records, he asked information services to send him plaintiff's emails for the days in question and he instigated the City's investigation by turning over to human resources the reports Hill had prepared. With respect to the "screaming" incident, Ragland asked LaFave–Bennett whether she would meet with someone from the city attorney's office and then

forwarded her complaint to the human resources department.

Defendants do not argue that Ragland's involvement in these investigations was so minimal that he was not personally involved in them. Although Ragland did not conduct a full investigation of these incidents on his own, it is unlikely that either investigation would have taken place if Ragland had not reported the incidents to the human resources department. Also, defendants do not argue that being investigated for alleged wrongdoing would be unlikely to deter an employee from exercising her right to free speech. Even if the decision to conduct a formal investigation could not be imputed to Ragland, I cannot say as a matter of law that Ragland's conduct was "so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs." *Pieczynski*, 875 F.2d at 1333.

Defendants argue instead that Ragland's limited involvement shows that he was not motivated by plaintiff's speech. I agree with defendants that, under most circumstances, a supervisor's investigation of an allegation of wrongdoing brought forward by another employee is not suspicious. As I noted in *Owens v. Ragland*, 313 F.Supp.2d 939, 950 (W.D.Wis.2004), "Falsifying documents is a serious charge." Thus, ignoring such an allegation could be seen as more surprising that a decision to investigate it.

However, plaintiff has adduced facts in this case that were not revealed in *Owens*. First, in *Owens*, Ragland testified, and the plaintiff did not dispute, that Hill had brought forth her allegations against plaintiff and Owens while Norman Davis was still the interim director, thus defeating the drawing of an inference that Ragland had been involved in making the allegation. Ragland gave similar testimony in this case, at least initially. Dep. of Ragland, dkt. # 17, at 127 (explaining that

May 6 email to information services was "in support of the investigation started by Norman Davis into falsification of payroll records"). However, in Ragland's affidavit, he admits that he was the one who delegated payroll responsibilities to Hill and that she did not report her concerns about falsified records until after he became the director. Aff. of Ragland, dkt. # 25, at ¶ 27, 49. Ragland does not even attempt to explain the discrepancy in his testimony about this highly relevant fact.

Also, Ragland testified that the reason he requested plaintiff's emails (rather than allow human resources to handle it) was that the City "required" department heads to make requests for employee emails. Dep. of Ragland, dkt. # 17, at 177. However, defendants have failed to produce a city rule or policy supporting Ragland's deposition; Wirtz and Stalcup both testified that Wirtz would have been authorized to make the request.

These problems with Ragland's testimony do not lessen the seriousness of the alleged offense, but they do begin to raise questions about his motivations for initiating an investigation. Actions that could have been justified on legitimate grounds still violate the First Amendment if the actual reason for the decision was the plaintiff's protected speech. An obvious question that has gone unanswered is why Ragland directed Hill to pore over payroll records more than four months old. Further, the explanation of "falsifying records is a serious offense" becomes less persuasive when plaintiff points to Ragland's testimony that he did not believe it was his responsibility to investigate "serious instances of dishonesty" that occurred before his appointment. He admits that he did not look into various allegations of misconduct department employees made to him after he was appointed. Although Ragland qualified this testimony by stating

that he thought it was important to "complete" investigations that his predecessor had initiated, he now admits that he, not Davis, initiated the time records investigation.

Defendant Ragland's motivation is further called into question by the manner in which he proceeded with the investigation. The logical first step after receiving the information from Hill would have been to contact plaintiff's former supervisor to determine whether she had approved plaintiff's time. Ragland instead initiated his own investigation and turned over his records to human resources only when no one responded to his request for information.

With respect to the "screaming" allegation, LaFave–Bennett made it clear to Ragland that her reasons for calling were related to the complaints plaintiff had filed against him. Further, the facts do not show that LaFave–Bennett told Ragland that she wanted to file a complaint against plaintiff. Rather, despite LaFave–Bennett's questionable motivations for making the allegation and the significant time lapse between the alleged incident and the complaint, Ragland took the initiative to *ask* LaFave–Bennett whether she would be willing to take her allegation to the city attorney. Then, instead of directing her to report her complaint to the appropriate body, Ragland contacted the human resources department the same day on her behalf, helping to insure that action would be taken on the allegation. Taken together, these facts demonstrate that there is an genuine issue of fact whether Ragland was motivated by plaintiff's complaints when he initiated these two investigations and whether he would have taken the same actions in the absence of her speech.

b. Conducting the investigations (Title VII claim against City)

▮ Although the question is a close one with respect to plaintiff's claim against the City for conducting the investigations, I conclude that plaintiff has adduced sufficient evidence to defeat summary judgment on it. As noted above, the City initiated each of three investigations within a week of the filing of plaintiff's complaint with the Equal Rights Division. (It was Brad Wirtz who conducted the investigations against plaintiff. Both sides assume that Wirtz's actions and motives may be imputed to the City, so I have done the same.) The court of appeals in different cases has placed varying degrees of importance on temporal proximity. *Compare Lang v. Illinois Dept. of Children and Family Services,* 361 F.3d 416, (7th Cir. 2004) (closeness in time combined with "other evidence" may "permit a plaintiff to survive summary judgment"), *and Adusumilli v. City of Chicago,* 164 F.3d 353, 363 (7th Cir.1998) (plaintiff may "establish" causation through evidence that adverse action "took place on the heels of protected activity"), *with Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640 (7th Cir.2002) ("mere temporal proximity" is "rarely" sufficient "in and of itself to create a triable issue"). However, it is established that closeness in time is "evidence of causation." *Lalvani v. Cook County,* 269 F.3d 785, 791 (7th Cir. 2001). The close timing may be more suspicious in this case because, as plaintiff points out, the City had never initiated an investigation against plaintiff until she filed her complaints, when it proceeded to initiate *three* investigations against her at the same time. *Lang,* 361 F.3d at 419–420 (timing of defendant's decision to discipline plaintiff "extremely suspicious" when plaintiff had never been disciplined previously); *Walker v. Board of Regents of the University of Wisconsin,* 300 F.Supp.2d 836 (W.D.Wis.2004) (suspicious nature of timing enhanced when defendant had not previously expressed displeasure with plaintiff's performance). Defendants at-

tempt to dispute this fact by citing a letter plaintiff wrote to Davis on March 10, 2003, in which she stated that she "believe[d]" that Christie Hill was "hosting an informal investigation" against her. Defendants, however, point to no evidence that such an investigation was taking place in fact or that, if it was, the City had authorized it.

Other facts surrounding the investigations support the drawing of an inference that the City was motivated by plaintiff's complaint in deciding to pursue these investigations. With respect to the confrontation with LaFave–Bennett, the facts show that Wirtz had declined to investigate similar allegations against others in the past and had never before conducted an investigation of behavior that had occurred more than six months earlier unless the behavior was continuing. *Troupe v. May Department Stores*, 20 F.3d 734, 736 (7th Cir.1994) (differential treatment is evidence of causation).

With respect to the investigation of plaintiff's accessing of Hill's email, it is undisputed that Hill had given plaintiff proxy rights to access her email. Further, in Wirtz's investigation report, he was unable to identify any rule or policy that plaintiff had violated. Finally, when plaintiff brought allegations to Wirtz's attention suggesting that Hill may have disclosed confidential information about the department to others, no investigation was conducted.

Plaintiff's thinnest case is the false time sheets investigation. The only specific fact suggesting a retaliatory motive is the method of Wirtz's investigation. Wirtz never asked plaintiff's supervisor whether she had approved the time in question. In isolation, this fact would not be sufficient to demonstrate an issue for trial. However, combined with the closeness in time of plaintiff's complaint and the investigations and the suspicious circumstances surrounding the other investigations, I con-

clude that plaintiff is entitled to present this claim to a jury. *Cf. Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 679 (7th Cir.2003) (employee need not show pretextual character of all employer's reasons when reasons are "intertwined").

4. *Campaign of harassment* (First Amendment claim against Ragland)

■ Plaintiff points to several actions taken by Ragland that she admits are relatively minor in isolation but which she contends are sufficient as a whole to show a campaign of harassment that is actionable under the First Amendment. *Power*, 226 F.3d at 820–21. Because I have concluded that the reduction in plaintiff's duties and the investigations against her are sufficiently adverse by themselves to permit recovery under the First Amendment, it is unnecessary to decide whether these actions meet the minimum standard either in isolation or together. (If the reduction in duties and the investigations are sufficient by themselves, any additional retaliatory actions, no matter how small, would only be a further deterrent to the exercise of free speech.)

However, two of the actions plaintiff points to cannot provide a basis for recovery for other reasons. With respect to the lost and damaged items, plaintiff's only evidence that defendant Ragland was involved is that one coworker saw him enter plaintiff's cubicle while she was absent from work. Ragland does not deny that he entered plaintiff's work space, but he testified that his reason for doing so was work-related and that he did not handle any of plaintiff's personal items. Plaintiff has failed to dispute this evidence, thus leaving only speculation to support this allegation, which is insufficient. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir.2003).

Second, I concluded in *Owens*, 313 F.Supp.2d at 949–50, that calling someone a "disgruntled employee" could not serve

as the basis for a First Amendment retaliation claim because doing so would threaten the defendant's own First Amendment rights. *See also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (no liability for statements that cannot be proved as true or false). Although plaintiff is aware of the *Owens* decision (she cited it for another proposition), she did not even attempt to distinguish her case or argue that *Owens* was decided wrongly.

 I come to a different conclusion with respect plaintiff's allegation that defendant Ragland was spreading false rumors about a relationship between her and Billy Harris, an employee in the department of workforce development. In support of these allegations, plaintiff relies solely on Harris's affidavit. Many of Harris's averments relate not to what defendant Ragland told him, but to what others told Harris that Ragland told them. With respect to these statements, Harris's affidavit is inadmissible hearsay. *Boyce v. Moore,* 314 F.3d 884, 889 (7th Cir.2002) (hearsay evidence offered for truth of matter not admissible to defeat summary judgment motion unless exception to hearsay rule applies); *Eisenstadt v. Centel Corp.,* 113 F.3d 738 (7th Cir.1997).

However, Harris avers also that he confronted defendant Ragland about the accusations he had heard from others and that Ragland admitted that he had told two people that Harris and plaintiff were "seeing each other." According to Harris, Ragland apologized for spreading the rumors and promised not to make similar "slanderous" accusations in the future. Defendants argue that these statements are inadmissible hearsay as well, but they are wrong. Because Ragland is a party, any admissions that he made to a third party are not hearsay. Fed.R.Evid. 801(d)(2).

The Court of Appeals for the Seventh Circuit has held that "false accusations" are actionable injuries under the First Amendment. *DeGuiseppe v. Village of Bellwood,* 68 F.3d 187, 192 (7th Cir.1995). Similarly, it has held in the Title VII context that "vicious gossip" may constitute an adverse action under Title VII. *Knox v. State of Indiana,* 93 F.3d 1327, 1335 (7th Cir.1996). In many situations, a statement that two people are "seeing each other" could not be considered "vicious gossip," even if it was false. However, plaintiff was married and had a child. Defendants cannot deny that an accusation of adultery can cause significant damage to a person's reputation. *See Muzikowski v. Paramount Pictures Corp.,* 322 F.3d 918 (7th Cir.2003) (false accusation of adultery is defamatory per se); *accord Klewin v. Bauman,* 53 Wis. 244, 10 N.W. 398 (1881).

 Plaintiff has not adduced any specific evidence that defendant Ragland made a false accusation because of her speech. However, viewing the record as a whole, a reasonable jury could find that plaintiff's complaints motivated Ragland to lie about her. Ragland has not articulated any other reason he would have had to make false statements.

 The question with respect to the remaining actions is whether there is sufficient evidence to allow a reasonable jury to find that plaintiff's protected speech motivated Ragland's decisions. I conclude that there is for some but not others. With respect to denying plaintiff access to the City's computer system, defendant Ragland's only explanation is that plaintiff did not "need" access while she was on leave. However, Ragland began removing plaintiff's access as early as May 15, 2003. According to plaintiff's affidavit, she had told Ragland on May 14 that she would be returning to work on May 16. Although Ragland disputes this fact, I must accept

plaintiff's version of events at this stage of the proceedings. (Defendant argues that the affidavit should be excluded under the sham affidavit rule. However, this rule applies only when there is an actual contradiction between the deposition and affidavit. Parties may "clarify or augment" their deposition testimony with additional facts in an affidavit. *Simmons v. Chicago Board of Education,* 289 F.3d 488, 492 (7th Cir.2002). In her deposition, plaintiff said she did not remember whether she gave Ragland a specific date that she believed she would return. It is not inherently contradictory to say that one remembers something now that she could not recall before. *Amadio v. Ford Motor Co.,* 238 F.3d 919, 926 (7th Cir.2001) (contradiction not shown by "lapse of memory"). Accordingly, I decline to strike plaintiff's affidavit.)

In any event, it is undisputed that plaintiff did not inform Ragland that she was taking an indefinite leave until May 21; up until then defendant had no reason to assume that plaintiff's return would not be imminent. This conclusion is supported by Ragland's own May 15 letter to plaintiff, in which he provides her with a detailed set of expectations for her upon her return to work. Although there is certainly nothing suspicious about delegating plaintiff's computer-related duties while she was gone, Ragland does not provide any explanation why he needed to remove plaintiff's access altogether. Ragland admits that he is aware of no other employee who has been denied computer access while on leave.

The two remaining actions involve an accident report and a city credit card. My understanding of plaintiff's claim is not that she is challenging Ragland's requests for plaintiff to fill out the accident report and return the card, but his decision to forward to various local officials a letter and an email in which he accused her of violating city policies. With respect to the May 14 email informing plaintiff that she was violating a city policy about filling out accident reports, it is undisputed that the information defendant had at the time he sent the email was that plaintiff had not turned in an accident report. (In response to defendants' proposed finding of fact on this issue, plaintiff writes: "Admit that Ragland says, in his affidavit, that the information he had from the City's risk manager was that no accident report had been submitted." Plt.'s Resp. to Dfts.' PFOF, dkt. # 34, at ¶ 189. To the extent that plaintiff means to suggest that what defendant Ragland said in his affidavit is not the truth, plaintiff's response failed to put defendants' fact into dispute because she did not cite any evidence calling Ragland's averment into question.) In addition, plaintiff does not deny that she failed to turn in the city credit card until May 30, 2003 as indicated in Ragland's June 4 letter, even though she told him that she had turned it in earlier. Thus, I cannot conclude that Ragland's "accusations" are suspicious.

Similarly, plaintiff does not adduce any evidence that would support a finding that Ragland sent copies of these letters to officials in the mayor's office, the human resources department and the city attorney's office because of plaintiff's protected speech. Plaintiff has not shown that this practice was unusual for Ragland. On the contrary, a great many of the emails in the record written by both plaintiff, defendant Ragland and others show that the same parties were often included in many communications. Plaintiff's claim that Ragland retaliated against her by accusing her of violating city policies must be dismissed.

5. *Reassignment* (Title VII claim against City)

Plaintiff challenges the City's decision to reassign her to the Madison Equal Opportunity Commission, where she

remained a "Secretary I" and retained the same pay. As defendants point out, "purely lateral transfers" are not considered to be adverse actions. *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270 (7th Cir. 1996). Although keeping the same pay, title and benefits is not an automatic bar to a Title VII claim, a plaintiff must be able to show some difference in the two jobs that makes one less objectively desirable. *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 702 (7th Cir.2001). Plaintiff contends that the transfer was not a lateral one because she had many responsibilities in the affirmative action department that she did not have in the equal opportunity office, but her comparison is problematic. She admits that at the time she was reassigned, defendant Ragland had already stripped her of all the duties she had acquired under Mack that did not fall within her job description. She points to no responsibilities that she would have retained upon her return to the affirmative action department that she did not have in the equal opportunity office. Thus, it is difficult to see how the transfer was adverse to plaintiff for the purposes of Title VII. This claim must be dismissed.

6. *Release of records* (Title VII claim against City)

 Defendants question initially "how the City's compliance with open records law could possibly constitute an adverse employment action." Dfts.' Br., dkt. # 24, at 30. However, it is not difficult to imagine circumstances in which the release of private and potentially damaging information about an employee could deter her from exercising her rights under Title VII.

Perhaps what defendants meant to ask is how a reasonable jury could find that the City complied with the law for a retaliatory reason. This would be a heavy burden and plaintiff has not come close to showing that the City was motivated by her complaints when it complied with the open records request. Although plaintiff argues in her brief that she was singled out for negative treatment, she has not submitted any evidence that the City analyzed requests for documents with her name any differently from documents with others' names. She proposes a fact that "the City redacted the names of all witnesses who came forward and provided information during the [City's] investigation, except Ms. Thomas' name." Plt.'s PFOF, dkt. # 33, at ¶ 388. However, the evidence cited does not support her proposal.

The facts do show that plaintiff's name was not redacted from all of the released documents, but it is undisputed that those documents were already available to the public in unredacted form. Plaintiff has adduced no evidence that other witnesses were or would have been treated any differently. Defendants' motion for summary judgment will be granted with respect to plaintiff's claim that the City violated Title VII by failing to redact her name from records released to the public.

D. *Qualified Immunity*

Defendants' argument on qualified immunity mixes up the law with the facts. In actions asserting constitutional violations, government officials are entitled to qualified immunity unless their conduct violated "clearly established" rights. *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Defendants do not deny that case law clearly establishes that it is unconstitutional to retaliate against public employees for speaking out on matters of public concern. *Gustafson v. Jones*, 290 F.3d 895 (7th Cir.2002) ("[T]he key elements of this case have been clear for years: a public employer may not retaliate against an employee who exercises his First Amendment speech rights."); *Delgado v. Jones*, 282 F.3d 511, 520 (7th Cir.2002) (finding it has been well-estab-

lished for many years that public employer may not retaliate against employee who exercises his First Amendment speech rights). Although the issue of qualified immunity must be decided "in light of the specific context of the case and not as a broad general proposition," *McGreal,* 368 F.3d at 683, defendants do not point to any matters of *law* in this case that would be unclear to a reasonable person.

Instead, defendants argue that defendant Ragland is entitled to qualified immunity because he had good reasons for taking all the actions he did that were unrelated to plaintiff's speech. However, this is simply a repeat of defendants' argument that there are no genuine issues for trial. In the discussion above, I have concluded that a reasonable jury could find that Ragland retaliated against plaintiff for exercising her First Amendment rights. The doctrine of qualified immunity does not require courts to resolve issues of credibility in favor of the government. Because defendants identify no other basis for claiming immunity, their motion for summary judgment on this ground will be denied.

### ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Enis Ragland, City of Madison and Municipal Mutual Insurance Company is DENIED with respect to plaintiff Kia Thomas's claims that

(1) Defendant Ragland retaliated against her for filing an ethics complaint and a discrimination complaint against him when he (a) reduced her duties, (b) initiated an investigation against plaintiff for falsifying time records and yelling at another city employee; (c) restricted her access to the City's computer system; and (d) falsely accused her of committing adultery, in violation of the First Amendment; and

(2) Defendant City of Madison retaliated against plaintiff for filing an ethics complaint and a discrimination complaint when it (a) reduced her duties and (b) initiated and conducted investigations against her for falsifying time records, talking loudly to another city employee and accessing another employee's email without authorization, in violation of Title VII of the Civil Rights Act of 1964.

In all other respects, defendants' motion is GRANTED.