**Becky PRINDLE, Plaintiff,**

v.

**TNT LOGISTICS OF NORTH AMERICA, Defendant.**

**No. 03–C–460–C.**

United States District Court,
W.D. Wisconsin.

Aug. 11, 2004.

Eric J. Haag, for Plaintiff.

Fred Gants, Quarles & Brady, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, Chief Judge.

In this civil action for monetary relief, plaintiff Becky Prindle accuses defendant TNT Logistics of North America of violating Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000e. Plaintiff alleges that defendant created a hostile work environment, discriminated against her on the basis of her sex and retaliated against her for complaining about sexual harassment. Jurisdiction is present. 28 U.S.C. § 1331.

Presently before the court is defendant's motion for summary judgment. As to plaintiff's sexual harassment claim, a reasonable jury could determine that defendant's response to plaintiff's harassment complaint was not prompt or appropriate and therefore, could find that defendant

was negligent. With respect to plaintiff's retaliation and discrimination claims, the undisputed facts show inconsistencies in defendant's explanation about why plaintiff was suspended for seven weeks and therefore raise questions of material facts that must go to a jury. I will deny defendant's motion for summary judgment on each of plaintiff's claims.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed. At the outset, I note that I treated defendant's proposed findings of fact ## 20, 22 and 23 as undisputed because plaintiff failed to support her response with admissible evidence, as required by this court's *Procedure to be Followed on Motions for Summary Judgment*, II.D.2. However, my consideration of these facts does not affect the outcome of the case.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Becky Prindle resides in Janesville, Wisconsin. Defendant TNT Logistics of North America, Inc. is a leading global logistics company that implements and operates complex supply chain solutions for medium to large enterprises. Defendant's national headquarters is located in Jacksonville, Florida, and it has facilities across the United States. Each facility is given an identification number. Defendant's Janesville, Wisconsin facility is "Contract 165." Workers at this facility sequence and subassemble parts and materials for "just-in-time" delivery to General Motors' Janesville facility. Contract 165 had two separate operations. On the trim side, workers handled the accent pieces of an automobile, such as door panels, moldings and carpets. On the chassis side, they handled parts pertaining to the frame, such as shocks, springs and brake drums. If defendant did not get the parts to General Motors in time, General Mo-

tors had to shut down its assembly line until the necessary parts arrived from defendant.

Plaintiff began working for defendant as a temporary employee on November 1, 2000. Her first assignment was working as a buffer on the second shift. When defendant eliminated the buffer position in February or March 2001, plaintiff took a T–10 loader position and worked in that position until defendant closed the Janesville facility on March 31, 2004, after losing its contract with General Motors.

### B. *Defendant TNT's Supervisory Structure*

Contract managers are the highest level management employees at local TNT facilities. Operations managers form the next level of supervision. Generally, there are two operations managers during each shift, one assigned to the trim side and the other to the chassis side. The lowest level of management are floor supervisors, who are responsible for day-to-day supervision of employees. Floor supervisors report to operations managers and do not have authority to hire, fire, promote, demote or transfer employees. They also lack authority to adjust employees' pay and cannot approve vacation time. Floor supervisors have no disciplinary powers except two types of nondiscretionary discipline: 1) discipline for violations of the attendance policy, pursuant to the collective bargaining agreement; and 2) discipline for failure to follow work instructions as posted. Floor supervisors must refer other problems to an operations manager, who can make discretionary discipline decisions.

### C. *Defendant's Policies and Procedures*

Defendant has both an equal employment opportunity policy and a policy prohibiting harassment. The equal employment opportunity policy guarantees each employee and applicant equal employment

opportunities. The employee harassment prevention policy prohibits all forms of harassment, including sexual harassment directed toward employees, customers or vendors. According to the policy, employees who believe that they are being subjected to harassment are to report the harassment to their supervisor, manager or the manager of labor and employee relations. If a supervisor or manager receives a harassment complaint, he or she must notify the manager of labor and employee relations, who must investigate the matter and take disciplinary action as appropriate. Plaintiff received training on defendant's harassment prevention policies and was familiar with them.

Defendant made available to its operations and contract managers a policies and procedures manual containing several discipline policies. Although the policies and procedures manual did not override the progressive disciplinary procedures contained in the collective bargaining agreement, the manual did specify the appropriate level of discipline for employees who damaged defendant's property or commodities.

The manual's policy 709 addressed "Carelessness/Unsafe Work Practice Discipline" and outlines progressive discipline procedures designed to address carelessness or unsafe work practices that do not cause injury or property damage. Policy 710 was entitled "Injury or Property Damage; Carelessness/Unsafe Work Practice Discipline" and outlined disciplinary procedures applicable to employee conduct that caused personal injury or property damage. The property damage section of policy 710 was divided into "minor property damage," covering damage of $500 or less, "major property damage," for damage exceeding $500; and "excessive property damage," covering damage over $2,500. For employees who caused minor property damage, the disciplinary steps were as follows: 1) the first occurrence resulted in a verbal warning with a memo placed in the employee's file and a one-day suspension; 2) a second occurrence led to the employee's receiving a letter of warning, retraining and a three-day suspension without pay; 3) a third occurrence led to a final letter of warning, retraining and a five-day suspension without pay; and 4) the fourth occurrence resulted in termination. Employees who caused major property damage were subject to the following disciplinary procedures: 1) the first occurrence resulted in a letter of warning, retraining and three-day unpaid suspension; 2) a second occurrence resulted in a final letter of warning, retraining and five-day unpaid suspension; and 3) a third occurrence resulted in termination. Employees who caused excessive damage could be disciplined by immediate termination.

The procedure section of policy 710 required a contract manager to investigate all incidents resulting in property damage and to document the incident using an incident report form. After an investigation, disciplinary action is to be taken as required by the policy. The policy in effect after April 1, 2002 required written documentation of discipline to be maintained in the worker's file. The previous policy did not contain such a requirement.

### D. *Sexual Harassment*

Shortly after plaintiff began working for defendant in late 2000, plaintiff was bending down to tie her shoe when a co-worker, Martice, came up behind her, put his hands between her thighs, lifted her up and told her that if she was not at work and married he "would fuck the living shit out of her." At first, plaintiff did not say anything. Later, when she had a bad dream, her husband took her to talk to Daryl Castona, one of defendant's human resource personnel. [The parties dispute

whether defendant took any action after plaintiff complained about Martice.]

Plaintiff worked on the trim side of the facility. In the first or second week of April 2001, Dean Langlois became plaintiff's floor supervisor. Langlois reported to Ralph Gleissner, the trimside operations manager for the second shift. Not long after Langlois became plaintiff's supervisor, Langlois approached the desk area where she sat and stood behind her. Langlois put one hand on each of her breasts (on top of her clothes) and rubbed his hands down while simultaneously asking her how she was doing and whether she was okay. Plaintiff told Langlois not to touch her because she did not like it and that he could talk to her without touching her. Langlois responded that he was just being friendly. The entire interaction lasted between 30 seconds and one minute. Plaintiff thought Langlois was drunk at the time.

Plaintiff reported the touching incident to Gleissner around 5:00 or 5:30 p.m. that day after Gleissner came out of the main office area onto the floor. Plaintiff told Gleissner that she had a problem with Langlois, that he had touched her and that something needed to be done about it. Plaintiff did not think that Gleissner was concerned with what she had told him. Gleissner told plaintiff not to worry and that he would take care of the problem.

The next day, plaintiff told Rick Boyce, her former floor supervisor, about the touching incident. In addition, she mentioned that Langlois had smelled like alcohol that day. Boyce asked plaintiff how Langlois had touched her and she told him that Langlois had rubbed his hands over the top of her shoulders and rubbed them down to her breast. Plaintiff told Boyce that she had informed Gleissner about the incident and that no one had responded to her. Within an hour, Boyce went to Gleissner and told him of plaintiff's comments. At some point, Boyce recommended to Gleissner that Langlois should be fired because of the combination of alcohol and allegations of touching women. Langlois did not touch plaintiff again after she spoke to Boyce.

On August 8, 2001, plaintiff and a female co-worker, Gabriel Cooper, were sitting outside on some stairs near defendant's loading dock. Langlois was standing at the bottom of the stairs looking up at plaintiff and Cooper while the three of them talked. Langlois looked up plaintiff's shorts while she sat on the dock above him. As Langlois came up the stairs to enter the plant, plaintiff and Cooper got up and went inside. Cooper entered the building first and plaintiff heard Langlois say something like, "Wow." Plaintiff did not say anything to Langlois about this incident but she reported it to her union representative, who told her to write a statement about it. In addition, Cooper wrote a statement about the incident. Cooper stated that Langlois was talking to her and to plaintiff but that she was not looking at him and did not see him looking up plaintiff's shorts or hear him say, "Wow." Around the time that Langlois looked up plaintiff's shorts, plaintiff brought Langlois's offensive behavior to Gleissner's attention on several occasions. He responded by giggling and saying, "Dean's a ladies' man."

Langlois referred to female employees in his dock area, including plaintiff, as "honey" and "dear." For example, when Langlois stopped by plaintiff's desk to pick up paperwork, he would say, "Thank you, dear" and then return to his duties. Plaintiff did not view Langlois's use of "honey" and "dear" as problematic until the touching incident occurred in the first or second week of April 2001. Plaintiff reported Langlois's use of "honey" and "dear" to Boyce when she spoke to him about the

touching incident. Plaintiff mentioned Langlois's use of the terms "honey" and "dear" with female employees in the charge that she filed with the Wisconsin Equal Rights Division.

Jeff Bailey, a contract manager for defendant, was responsible for labor relations and human resources beginning in July 2001. These duties included coordinating contact between management and the union on matters raised in employee grievances. The first and only contact Bailey ever had about sexual harassment complaints by plaintiff against Langlois occurred during the first or second week in August 2001. Bailey asked plaintiff to write a statement. Plaintiff's statement alleged sexual harassment by Langlois. She did not mention Langlois's use of "honey" and "dear" in the statement. Plaintiff wrote that a co-worker, Sandy Ziltner, heard Gleissner saying to Langlois, "Tell Pat [Burdick] don't worry [about forgetting to place brakes on a load]. This one is on me. Your [sic] a man."

Bailey investigated plaintiff's allegations of sexual harassment against Langlois in August 2001. He met with Langlois and conducted the investigation based on the information provided by plaintiff and Langlois. During the one or two week investigation, Bailey suspended Langlois. Bailey concluded that Langlois had a serious problem with alcohol because several people had reported smelling alcohol on his breath. During the investigation Ziltner reported that Langlois smelled like alcohol and rubbed her back in the first part of April 2001; Michelle Peterson reported that Langlois had rubbed her shoulders and that she had seen him rub the shoulders of a couple other female employees. Several weeks before Bailey's investigation into plaintiff's complaints, he received complaints from Heather Pearsall about Langlois's touching her.

At the conclusion of his investigation, Bailey found that Gleissner had failed to take action in response to plaintiff's complaint of sexual harassment against Langlois. Bailey terminated Gleissner for failing to follow defendant's sexual harassment policy by failing to inform either the human resources director or a contract manager after he learned of potentially inappropriate conduct. Bailey transferred Langlois to a supervisory position on the chassis side of the plant so that he would not have contact with plaintiff. Plaintiff had no personal contact with Langlois after his transfer. On September 12, 2001, Langlois resigned.

E. *Sex Discrimination and Retaliation*

1. *Failing to secure a load*

As a T–10 loader, plaintiff loaded already-sequenced racks of door panels, sun roofs and other parts into semi-trailers for delivery to the General Motors plant. Plaintiff and other loaders were required to secure the racks before sending the trailer to General Motors. Locking loads is the last thing a loader must do before a truck is able to leave for the General Motors plant. Securing the racks was an essential step because it prevented damage to the parts and the truck itself and protected against the potentially dangerous situation created when parts or racks fall off trailers en route. Plaintiff was aware that defendant expected loads to be secured before the trucks left defendant's Janesville facility and that she could get into trouble for failing to properly secure a load. If an employee failed to lock one of the loads, the first step would be an investigation. A suspension could be imposed if deemed appropriate.

On or about June 5, 2001, plaintiff forgot to lock a load. Brian Holman, a materials handler at General Motors, reported the incident to Gleissner. No corrective action was issued because no property damage

occurred. However, Gleissner placed a note in plaintiff's file, stating that Holman had reminded plaintiff to put the rail clamps on before that load left the dock.

On June 7, 2001, plaintiff forgot to lock a load. However, on this occasion her error was not caught before the truck left for the General Motors plant. Plaintiff's failure led to property damage to defendant's truck trailer, requiring an emergency repair call. Defendant had to replace two hinges on the trailer door and pound the door back in shape so that it could use the truck. The bill for the emergency repair to the trailer door was for $90.50.

Plaintiff's floor supervisor, Shawn Mueller, brought the accident to Gleissner's attention. Gleissner investigated the amount of damage and gave that information to Mueller, who used it to fill out the employee corrective action form. The corrective action form notes that plaintiff's mistake "nearly" shut down the General Motors plant but there is no indication that the plant did shut down in fact. Mueller brought the form back to Gleissner. When plaintiff punched out for the day, Boyce approached her and told her that she had forgotten her load lock. Boyce took plaintiff to his office where Linda Austin–Buss, the union representative, was waiting. Boyce informed plaintiff that he had to suspend her. The discipline slip authorizing the suspension was signed by Mueller, Gleissner and Austin–Buss. Plaintiff refused to sign the form. She wrote on the discipline slip that she disagreed with the discipline because she felt she "should be penalized equally." Plaintiff's suspension began on June 11, 2001 and was for an indefinite period because the length of the suspension depends on the outcome of the investigation. Defendant suspended plaintiff because she had failed to lock a load properly, with the result that extensive damage occurred to both a semi truck door and door panels

loaded into racks for delivery to General Motors, nearly causing shutdown of the plant, and because the June 7, 2001 incident was plaintiff's second violation.

Gleissner made the disciplinary decision with respect to the June 7, 2001 incident and decided initially to suspend plaintiff for one to two days. In general, the only factors Gleissner considers when deciding whether to discipline someone for failure to secure a load are whether there was a delay and the amount of damage. In accordance with policy 710, one factor that determines the appropriate level of discipline is the monetary amount of property damage. The length of the one or two-day suspension that Gleissner gave plaintiff was not based on the level of property damage or on any prior violations.

Plaintiff believed that Gleissner gave her the "run-around" about the date when she could return to work. She got tired of Gleissner's telling her to call Brian Wilson, the contract manager, and Wilson's telling her to call Gleissner. Eventually, she called a union representative who took over. For a week and a half, plaintiff called Wilson twice a day about her suspension.

On June 12, 2001, plaintiff submitted a written statement to her union, writing that the June 7, 2001 mistake was "the first and only time I have forgotten my brake on my trailers ... and Brian Holman in the meantime [was] helping me load my trailer, making sure everything is being loaded correctly when I almost forgot my brakes. When Tim pulled away I noticed it not being secured not Brian Holman ... I believe I should be penalized equally, the same as everybody else this has happened to." Plaintiff admits that she did not notice the missing locks until the truck began to pull away from the dock and that she failed to properly secure the load.

On June 18, 2001, plaintiff filed a grievance regarding her suspension, asking for "immediate reinstatement of job position/ of dock loader/ all benefits/ loss of wages and retain seniority." In addition, the grievance states "Discrimination, harassment and improper suspension due to lack of equalization of the suspension. Loss of wages from suspension not being resolved—time factor." Gleissner denied plaintiff's request on June 20, 2001.

Contract manager Bailey became involved in plaintiff's grievance at Level 3 of the grievance process, which required a meeting between defendant and the union. Once Bailey and the union were able to schedule a meeting, the parties discussed the facts presented by each employee's grievance. On or about July 24, 2001, Bailey met with the union chairperson to discuss plaintiff's grievance as well as other grievances. Bailey tried unsuccessfully to determine the amount of damage that resulted from the June 7, 2001 incident and how much was attributable to plaintiff's negligence. He concluded that plaintiff should not be terminated. To settle plaintiff's grievance, defendant agreed to bring her back to work with benefits but no back pay. According to Bailey, the only factor that led to his opinion that plaintiff's suspension should be without back pay was the amount of damage. Although Bailey did not know the exact dollar amount of damage that occurred as a result of the June 7, 2001 incident, it was less than $2,500. When Bailey decided to bring plaintiff back to work on or about July 30, 2001, he was not aware that plaintiff had ever complained about sexual harassment.

On or about July 30, 2001, the union informed plaintiff that she could return to work. Plaintiff returned to work on August 1, 2001, with the same pay, benefits, duties and shift as she had before the suspension. She had been off work for a total of seven weeks. For two of those, defendant was on its two-week July shut down period during which no employees worked or received pay.

Gleissner believes that his role in the disciplinary process for an employee's failure to lock a load ended when he gave his report to the contract manager, who at the time of the June 7, 2001 incident, was Brian Wilson. Gleissner would have called the contract manager, told him what happened and suggested a suspension for a given length of time; the contract manager would decide whether to follow Gleissner's recommendation. Bailey was not involved in deciding the length of plaintiff's suspension. His only involvement was to settle her grievance. At the end of the grievance process, regardless of its length, the suspension can be shortened. Defendant would document the length of the suspension on the grievance form. Disciplinary action determined to be inappropriate once the grievance process has run its course is removed from the employee's record. The level of discipline meted out would be decided in consultation with the operations manager, who would have been Gleissner, as of June 2001. Defendant has not produced any documents disclosing the amount of damage resulting from plaintiff's June 7, 2001 mistake.

### 2. Treatment of other employees

It was not uncommon for suspended employees to never learn of defendant's investigation results. Often, employees must contact the union or file a grievance in order to return to work. Some employees who were terminated for various rule violations were rehired after contacting the union and filing a grievance.

According to Gleissner, plaintiff's suspension is the longest suspension of which he is aware for an employee's failure to secure a load. He is not aware of any

policy that provides for a suspension longer than two weeks for failure to secure a load.

Some of defendant's employees have forgotten to secure loads and have not been suspended without pay. For example, Bruce Spooner received a written warning when he failed to lock a load in June 2001, causing the truck's trailer door to pop open. He was not suspended because there was no property damage. There were occasions when Spooner heard Gleissner give someone a pass for failing to secure a load and instead of writing them up or giving them an official verbal warning, would simply tell them not to do it again.

Pat Burdick received a verbal warning on June 7, 2001, signed by Langlois and Gleissner, when he failed to properly secure a load, which resulted in parts' being displaced and a delay in the truck's departure to General Motors. Burdick was not suspended because there was no property damage. On June 20, 2001, Burdick again failed to attach the locks on his load causing less than $500 in property damage. With the approval of the contract manager, Gleissner suspended Burdick for one day without pay. On November 28, 2001, Amanda Schlegel received a suspension for her second violation of failing to secure a load that resulted in property damage. Defendant failed to identify the amount of property damage caused by Schlegel and it did not disclose the length of the suspension. On June 18, 2002, Peg Welda received a written warning for failing to secure her load, with the result that a rack fell off the back of the truck. Defendant failed to disclose the amount of property damage done or the length of the suspension.

Plaintiff filed a complaint with the Wisconsin Equal Rights Division on February 20, 2002.

## OPINION

Plaintiff argues that defendant violated her rights under Title VII by creating a sexually hostile work environment, discriminating against her on the basis of her sex and retaliating against her for complaining about Langlois's sexually harassing behavior.

### A. *Sexual Harassment*

■ Section 703(a) of Title VII prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e–2(a)(1). Courts have long recognized that employers may be responsible for sexual harassment in the workplace under Title VII. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751–55, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In sexual harassment claims brought under Title VII, an employer's liability is determined by the status of the harasser and the type of injury caused by the harassment. *Id.* at 759, 118 S.Ct. 2257. If the harasser is the plaintiff's superior, the employer is vicariously liable; the employer may avoid liability only if the plaintiff did not suffer a tangible job detriment and the employer can prove both that it exercised reasonable care to correct and prevent the harassment and that the plaintiff unreasonably failed to take advantage of the employer's corrective or preventative opportunities. *Id.* at 765, 118 S.Ct. 2257. For co-worker harassment, the standard of liability for the employer is negligence. *Id.* at 758–59, 118 S.Ct. 2257 (quoting *Restatement of Agency* § 219(2)); *Williams v. Waste Management of Illinois Inc.*, 361 F.3d 1021 (7th Cir.2004).

■ Plaintiff contends that Langlois sexually harassed her when he put one hand on each of her breasts (on top of her clothes) and rubbed his hands down while simultaneously asking her how she was doing and if she was okay. Defendant argues that this incident is time barred

because it occurred more than 300 days from the date when plaintiff filed her charge with the Equal Rights Division. In Wisconsin, a charge of discrimination actionable under federal law is timely if it is filed with the Equal Rights Division within 300 days of the alleged discriminatory act. *See Wisconsin Employment Law,* §§ 14.182, 14.247 (1998); *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Plaintiff filed her complaint with the Equal Rights Division on February 20, 2002. The touching incident occurred either in the first or second week of April 2001. Reading all facts in favor of the plaintiff, I will assume that the touching incident occurred at the end of the second week in April 2001. If the touching incident occurred on Friday, April 13, 2001, the number of days between the incident and plaintiff's filing a charge with the Equal Rights Division is 313. Therefore, the touching incident is outside the 300–day window.

Plaintiff argues that the court should still consider the touching incident because it is part of a continuing violation claim. "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 707 (7th Cir.1995); *see also Morgan,* 536 U.S. at 117, 122 S.Ct. 2061 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."). Plaintiff states that the incidents when Langlois looked up her shorts and said, "Wow" and the numerous times Langlois called her and other female employees "honey" and "dear" occurred within the 300–day window. It is undisputed

that the shorts incident occurred on August 8, 2001, and that Langlois's calling female employees, including plaintiff, "honey" and "dear" was a recurring event. Plaintiff mentioned Langlois's use of the terms "honey" and "dear" with female employees in her charge filed with the Wisconsin Equal Rights Division. These acts occurred within the statutory time period and plaintiff viewed Langlois's use of the terms "honey" and "dear" as contributing to a hostile work environment. *Morgan,* 536 U.S. at 117, 122 S.Ct. 2061 ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice'" and "[t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.").

In response, defendant cites *Hall v. Bodine Electric Co.,* 276 F.3d 345, 353 (7th Cir.2002), in which the court held that a plaintiff "may not base her ... suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct ..." (citing *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1167 (7th Cir.1996)). However, in *Morgan,* 536 U.S. at 117, 122 S.Ct. 2061, the Supreme Court overturned the rule in *Hall* and *Galloway* on which defendant relies, stating that "[i]t is precisely because the entire hostile work environment encompasses a single unlawful employment practice *that we do not hold,* as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct" (emphasis added). Rather, "[i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the

hostile work environment." *Id.* at 118, 122 S.Ct. 2061. Nevertheless, an employer may have recourse when a plaintiff unreasonably delays filing a charge by proving (1) lack of diligence by the plaintiff in filing a suit; and 2) prejudice to the employer. *Id.* at 121–122, 122 S.Ct. 2061. Defendant does not argue that either of the circumstances is present in this case. Even if it had, it is hard to believe that a delay of 13 days shows a lack of diligence on the part of plaintiff or that defendant is prejudiced by the delay.

The question becomes whether the breast touching incident is "related closely enough" to the subsequent shorts incident and Langlois's use of the terms "honey" and "dear" that the acts can be "considered one ongoing violation." *Koelsch,* 46 F.3d at 707 (to assert successful continuing violation claim, facts alleged to have occurred within 300–day period must be "related closely enough to prior acts such that they are considered one ongoing violation"). I conclude that they are. In *Koelsch,* the plaintiff failed to demonstrate a nexus between two incidents of unwelcome physical contact by the company president that occurred outside the 300–day window with subsequent incidents that involved the president "only at the extreme periphery." *Id.* In contrast, the shorts and "honey" and "dear" incidents involved the same person who perpetrated the breast touching incident. [I note that plaintiff attempts to add the incident involving her co-worker Martice coming up behind her, grabbing her and saying that he "would fuck the living shit out of her" as part of her hostile work environment claim. Because that incident involved another employee, the relationship is not close enough to the acts that occurred within the 300–day window to consider that incident part of the hostile work environment claim.] Furthermore, the shorts incident occurred within four months of the breast touching incident. The short

time between those two events, coupled with the ongoing "honey" and "dear" comments, creates a sufficient nexus between the breast touching incident and the subsequent behavior by Langlois. Therefore, the breast touching incident is part of a hostile environment claim and is not time-barred.

■ The inquiry is not over, however. To maintain a claim of a hostile work environment, the plaintiff must demonstrate that her co-worker or supervisor harassed her because of her sex and that this harassment was " 'so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive environment' " *Hilt–Dyson v. City of Chicago,* 282 F.3d 456, 462 (7th Cir.2002) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). "Moreover, a hostile work environment is one that is 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' " *Id.* The parties agree that plaintiff was offended by Langlois's actions. Therefore, it is necessary to determine only whether Langlois's actions meet the objective prong of the hostile work environment test.

■ Defendant argues that a reasonable person would not perceive the three incidents described above as severe or pervasive. I note that the harassment need not be both severe and pervasive; "one or the other will do." *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir.2000) (no "magic number" of incidents required to establish hostile environment; even one act of harassment will suffice if it is egregious). With respect to the breast touching incident, defendant contends that a single incident of touching is not enough to show an objectively hostile work environment. For support, defendant cites *Sax-*

ton v. American Tel. & Tel. Co., 10 F.3d 526 (7th Cir.1993), in which the court found that two instances of sexual misconduct, one involving the supervisor's rubbing Saxton's upper thigh and then pulling her aside and kissing her and one in which the supervisor "lurched" at Saxton as if to grab her, insufficient to support a sexual harassment claim. The acts of sexual misconduct in Saxton, however, are quite different from the breast touching incident experienced by plaintiff.

The incident in plaintiff's case is more akin to those in Hostetler, 218 F.3d at 807–808, where Hostetler's co-worker inserted his tongue inter her mouth without invitation and tried to remove her brassiere. Contact with intimate parts of one's body is not conduct that would be anticipated in the workplace. It is of such a nature that a reasonable person in plaintiff's position "might well experience that type of behavior as humiliating, and quite possibly threatening." Id. at 808–809. "Holding such acts not to be severe as a matter of law is another way of saying that no reasonable person could think them serious enough to alter the plaintiff's work environment." Id. A reasonable jury could find Langlois's touching of plaintiff's breasts sufficiently invasive, humiliating and threatening to poison plaintiff's working environment. It is undisputed that after the breast touching incident, plaintiff viewed Langlois's habitual references to her and other female employees as "honey" or "dear" as problematic. Therefore, I conclude that there is at least a genuine issue of material fact whether the breast touching incident created a hostile work environment for plaintiff.

■ The final question to address in plaintiff's hostile work environment claim is whether defendant is liable for Langlois's harassing behavior. "The standard for employer liability turns on whether the alleged harasser was the plaintiff's super-

visor, instead of a mere co-worker." Rhodes v. Illinois Dept. of Transportation, 359 F.3d 498, 505 (7th Cir.2004). An employer is vicariously liable for the harassing actions of its supervisors. Faragher, 524 U.S. at 807, 118 S.Ct. 2275. On the other hand, an employer is liable for harassing conduct by a co-worker only when it fails to take reasonable steps to remedy the harassment once it is on notice that the harassment occurred. Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 976 (7th Cir.2004). Plaintiff argues that Langlois qualifies as a "supervisor" under Title VII because he had significant authority over her daily work activities. However, the Court of Appeals for the Seventh Circuit has held that for the purposes of Title VII, supervisors must have the power to directly affect the terms and conditions of the plaintiff's employment, which includes the authority to hire, fire, promote, demote, discipline or transfer the plaintiff. Rhodes, 359 F.3d at 506. It is undisputed that as a floor supervisor, Langlois did not have the authority to hire, fire, promote, demote or transfer employees. Therefore, Langlois does not qualify as a supervisor under Title VII and defendant is not vicariously liable for his actions.

■ It is another matter whether defendant is liable for his actions because it was negligent in remedying the harassing behavior. With respect to the actions of a co-worker, defendant "will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures once apprised of the harassment." Hostetler, 218 F.3d at 809. Plaintiff contends that defendant was negligent in its response to Langlois's harassing behavior because it never disciplined him or took any serious action to prevent the harassment from occurring in the first place. Defendant points out that after plaintiff

reported her concerns about Langlois to Boyce, Langlois never touched her again.

"In hostile work environment cases, the employer can avoid liability for its employees' harassment if it takes *prompt* and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman v. WBBM–TV, Inc./ CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000) (emphasis added). It is undisputed that on the same day that the breast touching incident occurred, plaintiff informed Gleissner about it and that under defendant's sexual harassment policy he was an appropriate person to approach. In addition, it is undisputed that Bailey found that Gleissner had failed to take action in response to plaintiff's complaint of sexual harassment against Langlois. In fact, around the time that Langlois looked up plaintiff's shorts on August 8, 2001, four months after the breast touching incident, plaintiff had brought Langlois's offensive behavior to Gleissner's attention on several occasions and he had responded by giggling and saying, "Dean's a ladies man." After plaintiff complained to Boyce about the breast touching incident, he merely presented the problem to Gleissner. Approximately four months after the breast touching incident, in August 2001, plaintiff informed Bailey of her problem with Langlois. It was not until Bailey became involved that defendant first investigated Langlois's behavior. As a result of the investigation, Bailey terminated Gleissner for failing to follow defendant's sexual harassment policy and transferred Langlois to the chassis side of defendant's facility so that he would not come into contact with plaintiff.

Defendant argues that Bailey's investigation and subsequent transfer of Langlois meets the standard for avoiding liability. However, the undisputed facts show that defendant was aware of Langlois's behavior toward plaintiff at least four months before it investigated plaintiff's complaint against him. This four-month delay at least raises a question of material fact whether defendant's response was prompt. In determining whether a delay in response to a sexual harassment complaint is negligent, the Court of Appeals for the Seventh Circuit considered whether the plaintiff was injured by the employer's failure to act more quickly. *Hostetler*, 218 F.3d at 809 (no evidence that Hosteller was in any way injured by Quality's failure to act more quickly). Gleissner's failure to act on plaintiff's complaint against Langlois may have caused her injury by exposing her to further inappropriate behavior by Langlois. Had Gleissner acted promptly, the August 8, 2001 shorts incident may never have occurred and the continuous references to plaintiff as "honey" and "dear" may have ceased. *Hostetler*, 218 F.3d at 809 ("An employer is no doubt obligated to act with dispatch when it is informed that an employee is effectively assaulting his coworkers."). That defendant ultimately fired Gleissner for failing to act on plaintiff's complaint is of no consequence. A reasonable jury could determine that defendant's response to plaintiff's harassment complaint was not prompt or appropriate and therefore, could find that defendant was negligent. I will deny defendant's motion on plaintiff's sexual harassment claim.

### B. *Retaliation*

██ Title VII makes it an unlawful employment practice "for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); *Wyninger*, 361 F.3d at 982. "Thus, under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an em-

ployee for opposing impermissible discrimination." *Wyninger*, 361 F.3d at 980–81 (internal citations omitted).

Plaintiff argues that defendant retaliated against her for complaining to Gleissner about Langlois after the breast touching incident because soon after her complaint, Gleissner suspended her for failing to secure a load. Plaintiff contends that her seven week suspension is suspicious because there is no evidence of extensive property damage to justify the length of her suspension and other employees who had not complained of sexual mistreatment were not disciplined as harshly for failing to secure a load. Defendant responds that the level of property damage caused by plaintiff's mistake justifies the level of discipline and that the time frame between her complaint about Langlois and her suspension is too remote to link the two events, especially when one considers plaintiff's admitted mistake of failing to secure a load.

An employee may pursue a retaliation charge in one of two ways: 1) the direct method, using either direct or circumstantial evidence; or 2) the indirect method, based on the burden shifting analysis in *McDonnell Douglas*. *Wyninger*, 361 F.3d at 981. Under the direct method, an employee "must show that she engaged in protected activity and suffered an adverse employment action as a result." *Id.* Direct evidence essentially "requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Cerutti v. BASF Corporation*, 349 F.3d 1055, 1061 (7th Cir.2003). A plaintiff that lacks evidence of such an admission can construct a "convincing mosaic of circumstantial evidence that points directly to a discriminatory reason for the employer's action." *Davis v. Con–Way Transportation Central Express, Inc.*, 368 F.3d 776, 783 (7th Cir.2004). For example, evidence "that a defendant's explanation for an employment practice is 'unworthy of credence' is 'one form of circumstantial evidence that is probative of intentional discrimination.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). A plaintiff may rely on decision makers' remarks or behavior that either acknowledges discriminatory intent or more ambiguously supports an inference of discrimination. *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). In addition, a plaintiff may show that similarly situated employees were given more favorable treatment. *Id.* Finally, a plaintiff may show that she was qualified for the job but replaced by someone outside her protected class and that the employer's stated reasons for the job action are unworthy of belief. *Id.*

■ The parties do not dispute that plaintiff's complaint about Langlois was protected activity or that her suspension was an adverse employment action under Title VII. Rather, their dispute hinges on causation: whether plaintiff's complaint about Langlois caused her suspension. In *Thomas v. Ragland*, 324 F.Supp.2d 950, 974–75 (W.D.Wis.2004), I noted that the Court of Appeals for the Seventh Circuit in *Spiegla v. Hull*, 371 F.3d 928, 943 n. 10 (7th Cir.2004) "concluded that the causation analysis is the same for retaliation cases brought under Title VII and the First Amendment." Therefore, to show causation in Title VII retaliation cases, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the decision." *Thomas*, 324 F.Supp.2d at 975. If a plaintiff can make this showing, then the burden of persuasion shifts to the defendant to show that it would have made the same decision with-

out regard to the plaintiff's protected conduct. *Id.* at 973–74. "[E]ven if the employer proves that it would have taken the same action in the absence of the impermissible factor, the plaintiff may still obtain declaratory relief, some forms of injunctive relief and attorney fees." *Id.*; 42U.S.C. § 2000e–5(g)(2)(B).

 Plaintiff's primary piece of circumstantial evidence that defendant retaliated against her for complaining about Langlois is the length of her suspension compared to other employees who did not complain. She contends that defendant is unable to justify or explain the length of her suspension. The undisputed facts contain many contradictions and ambiguities about the reason for plaintiff's suspension, its length, and who was responsible for determining the length of her suspension. For example, it is undisputed that plaintiff's suspension began on June 11, 2001 and was for an indefinite period because the length of the suspension depends on the outcome of the investigation. It is undisputed also that policy 710 imposes different levels of discipline depending on the amount of property damage that occurs from an employee's mistake. For damage less than $500, an employee is disciplined with a one-day suspension after the first occurrence and three-day suspension after the second occurrence. For damage between $500 and $2,500, defendant imposes a three-day suspension after the first occurrence and a five-day suspension after the second occurrence.

Bailey was unable to determine how much of the property damage from the June 7, 2001 incident was attributable to plaintiff's negligence and he concluded that plaintiff should not be terminated. Although Bailey did not know the exact dollar amount of damage that occurred as a result of the June 7, 2001 incident, it was less than $2,500. Therefore, under policy 710, defendant should have suspended plaintiff for no more than five days, assuming that the damage exceeded $500 and that the June 7, 2001 incident was her second mistake. This is a generous assumption, however, because defendant has been unable to produce any documentation regarding the amount of damage plaintiff caused and because the June 5, 2001 incident resulted in no property damage.

Defendant argues that the version of policy 710 in effect on June 7, 2001 did not require it to maintain documentation of property damage as did the policy in effect after April 1, 2002. However, it is undisputed that Peg Welda received a written warning on June 18, 2002, when a rack fell off the back of a truck after she failed to secure her load. Even though Welda's mistake occurred after April 1, 2002, defendant has failed to disclose the amount of property damage done or the length of Welda's suspension. This failure violates its own policy.

Furthermore, it is undisputed that Gleissner made the disciplinary decision with respect to the June 7, 2001 incident and decided to suspend plaintiff for one to two days initially. Defendant admits that the length of the one or two-day suspension that Gleissner gave plaintiff was *not* based on the level of property damage or on any prior violations. Yet Gleissner states that the only factors he considers when deciding whether to discipline someone for failure to secure a load are whether there was a delay and the amount of damage. In plaintiff's case, I assume that Gleissner made an exception to his usual protocol by considering something other than the level of property damage done or her prior violations. What this other consideration was raises a question of fact whether plaintiff's earlier complaint to him about Langlois was a motivating factor in his decision to suspend her.

As for the length of plaintiff's suspension, it is undisputed that during two of the seven weeks defendant was on its two-week July shut down period during which no employees of defendant worked or received pay. However, it is unclear who was responsible for determining the length of plaintiff's suspension. Bailey was not involved in the decision. His only involvement was to settle her grievance. Although Gleissner asserts that his role in the disciplinary process for an employee's failure to lock a load ended when he gave his report to the contract manager, he admits that in general, he would have suggested a suspension for a given length of time to the contract manager and that it would be up to the contract manager whether to follow Gleissner's recommendation. Moreover, defendant can reduce the level of discipline if it is later found inappropriate. The discipline meted out would be decided in consultation with the operations manager, who as of June 2001, would have been Gleissner. It is perplexing why defendant failed to reduce plaintiff's suspension without pay after Bailey determined that the amount of damage caused by plaintiff was less that $2,500 and under the version of policy 710 in effect at the time, the harshest discipline available was a five-day unpaid suspension. It is clear, however, that according to Gleissner, plaintiff's suspension is the longest suspension of which he is aware for an employee's failure to secure a load and that he is not aware of any policy that provides for a suspension of longer than two weeks for such violation. Plaintiff has adduced sufficient circumstantial evidence to allow a trier of fact to conclude that her complaint of harassment played a role in the length of her suspension. Defendant's motion for summary judgment on plaintiff's retaliation claim will be denied.

### C. Discrimination

As in the retaliation analysis under Title VII, a plaintiff establishes a discriminatory employment practice when she demonstrates that her sex was a "motivating factor" in the employer's decision. 42 U.S.C. § 2000e–2(m); *see also Venters v. City of Delphi*, 123 F.3d 956, 973 n. 7 (7th Cir.1997). In other words, the plaintiff must prove that her sex was one of the reasons that the employer took adverse action against her. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). As before, the plaintiff may use direct or circumstantial evidence to meet this burden. *Desert Palace*, 539 U.S. at 99, 123 S.Ct. 2148. Once a plaintiff demonstrates that sex was a motivating factor in an employment practice, the employer may limit its liability by demonstrating that it "would have taken the same action in the absence of the impermissible motivating factor." *Id.*, at 94–95, 123 S.Ct. 2148.

Plaintiff argues that defendant treated her more severely than similarly situated employees who failed to secure a load. In particular, plaintiff points to the treatment of Pat Burdick, who both parties assume to be a male. It is undisputed that Burdick received a verbal warning on June 7, 2001, signed by Langlois and Gleissner, when he failed to properly secure a load, which resulted in parts' being displaced and a delay in the truck's departure to General Motors. Burdick was not suspended because there was no property damage. Burdick's mistake on June 7, 2001 is similar to plaintiff's on June 5, 2001; neither Burdick nor plaintiff was suspended when their mistake did not result in property damage. However, on June 20, 2001, Burdick failed again to attach the locks on his load resulting in less than $500 in property damage. With the approval of the contract manager, Gleissner suspended Burdick for one day without pay. Unlike Burdick, plaintiff's second mistake led to an indefinite suspension that according to defendant would depend

upon the amount of property damage. That suspension lasted seven weeks without pay. According to Gleissner, plaintiff's suspension is the longest suspension of which he is aware for an employee's failure to secure a load. He is not aware of any policy that provides for a suspension of more than two weeks for failure to secure a load.

Defendant's explanation for the disparity in treatment between plaintiff and employees like Burdick is that Burdick's mistake resulted in less property damage, leading to less punishment. Yet Bailey did not know the level of property damage caused by plaintiff when he decided to bring plaintiff back to work without pay after seven weeks. Therefore, it is difficult to understand how defendant can offer such an explanation with any confidence. Furthermore, defendant admits that the length of the initial one or two-day suspension that Gleissner gave plaintiff was *not* based on the level of property damage done or on any prior violations. Comparing the differing treatment between plaintiff and Burdick alone, a reasonable jury could conclude that Gleissner suspended plaintiff because of his discriminatory animus toward her. Plaintiff has provided enough circumstantial evidence to meet her burden under the direct method. Because material questions of fact exist, I will deny defendant's motion for summary judgment as to plaintiff's discrimination claim.

## ORDER

IT IS ORDERED that defendant TNT Logistics of North America's motion for summary judgment on plaintiff Becky Prindle's claims of sexual harassment, retaliation and discrimination under Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000e, is DENIED.